[Cite as *In re V.B.-S.*, 2013-Ohio-5448.]

IN THE COURT OF APPEALS OF OHIO

TENACE APPELLATE DISTRICT

| | | |
|---|---|---|
| In the Matter of: | : | |
| | | No. 13AP-478 |
| V.B.-S., | : | (C.P.C. No. 10JU-08-11756) |
| (V.B., | : | (REGULAR CALENDAR) |
| Appellant). | : | |

D E C I S I O N

Rendered on December 12, 2013

*Yeura R. Venters, Public Defender,* and *John W. Keeling,* for appellant V.B.

*Robert J. McClaren,* for appellee Franklin County Children Services.

APPEAL from the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch

DORRIAN, J.

{¶ 1} Appellant, V.B. ("Mother"), appeals from a judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, granting permanent custody of her minor child, V.B.-S., to appellee, Franklin County Children Services ("FCCS"). For the following reasons, we affirm.

**I. FACTS AND PROCEDURAL HISTORY**

{¶ 2} V.B.-S. was born November 21, 1998, in Mexico. Mother came to the United States when V.B.-S. was two years of age, and V.B.-S. came to live with her approximately two years later. The parties have stipulated that V.B.-S.'s father has abandoned the child and has failed to provide food, clothing, shelter or other basic necessities for the child.

{¶ 3} In May 2010, FCCS became aware of possible physical abuse of V.B.-S. On May 18, 2010, Mother agreed to the voluntary temporary placement of V.B.-S. with one of her friends, Maria, and Maria's husband.

{¶ 4}   On August 24, 2010, FCCS filed a complaint alleging that V.B.-S., who was then 11 years old, was an abused, neglected or dependent child.  In its complaint, FCCS alleged that, in 2004 and 2009, the agency had substantiated referrals asserting that V.B.-S. had been neglected and physically abused.  It alleged that Mother had inflicted physical punishment on V.B.-S. by punching him in the face, causing pain, swelling, and discoloration.  V.B.-S. also was observed to have old scars on the top of his head.  The agency further alleged that Mother, V.B.-S., and Mother's three other children had been living with Maria prior to the punching incident, but Mother and her other children left Maria's residence after the incident, while V.B.-S. remained in Maria's home. Mother has repeatedly asserted that her ex-boyfriend, who was the father of two of Mother's other three children, had inflicted most of the physical abuse on V.B.-S.  The record suggests that the boyfriend was deported as the result of involvement with the criminal justice system.

{¶ 5}   On August 27, 2010, the court issued a Juv.R. 13(B)(2)(a) temporary order giving temporary custody of V.B.-S. to Maria and a temporary order of protective supervision to FCCS.

{¶ 6}   On November 12, 2010, the court adjudicated V.B.-S. to be an abused minor as defined in R.C. 2151.031(D), a neglected minor as defined in R.C. 2151.03(A)(2), and a dependent minor as defined in R.C. 2151.04(C).  It granted temporary custody to Maria and entered a protective supervision order to FCCS as authorized by R.C. 2151.353(A)(1).

{¶ 7}   FCCS obtained counseling services for V.B.-S., which began in July 2010. In November 2010, V.B.-S. began counseling sessions with Rebecca Guhl, a licensed family counselor and professional clinical counselor at The Buckeye Ranch.  She remained his counselor until August 2012.

{¶ 8}   The parties have stipulated that, since May 18, 2010, when Mother voluntarily placed V.B.-S. with Maria, V.B.-S. has resisted visiting with Mother, as described below.

{¶ 9}   In July 2010, V.B.-S. was scheduled to visit Mother after a counseling session at the The Buckeye Ranch, but when he saw Mother in the lobby he trembled and became frightened and refused to visit with her.  He only visited with his younger siblings.

{¶ 10} On August 9, 2010, V.B.-S. told his caseworker that he did not want to visit Mother or speak with her on the phone. On October 8, 2010, Maria and her husband found

V.B.-S. in bed with a belt around his neck. V.B.-S. was then placed in the intensive care center at The Buckeye Ranch for a short period of time due to his suicidal ideations. During October, November, and December 2010, and in February and April, 2011, V.B.-S. again told his caseworker that he did not want to visit his Mother.

{¶ 11} In May 2011, V.B.-S. once again told his caseworker that he did not want to visit Mother or even talk to her on the phone. The caseworker assured V.B.-S. that either she or his counselor would be present during a visit, but V.B.-S. repeated that he did not want to visit because he was still afraid of Mother. On May 24, 2011, V.B.-S. met with his siblings, but, when he saw Mother in the lobby, he cowered behind the caseworker.

{¶ 12} On June 23, 2011, Maria told V.B.-S. that she and her husband were unwilling to proceed with legal custody proceedings. Maria reported that she had told V.B-S that the court might return him to Mother and that V.B.-S. responded that, "if the court ordered him to go to his mother, he would run out of the court room and kill himself." (Joint Stipulation No. 44.)

{¶ 13} On July 8, 2011, FCCS moved the court for an order terminating Maria's temporary custody of V.B.-S. and awarding temporary custody to FCCS. Also, in July 2011, counselor Guhl reported in writing that she believed it would be detrimental for V.B.-S. to visit with Mother.

{¶ 14} In its motion seeking temporary custody, FCCS represented that V.B.-S. remained fearful of Mother but was receiving counseling and had been prescribed medication. The agency further reported that V.B.-S. was struggling behaviorally both at home and at school, and that Maria was no longer willing to have him in her home. V.B.-S.'s court-ordered guardian ad litem supported the award of temporary custody to FCCS. On July 28, 2011, the court granted temporary custody of V.B.-S. to FCCS and ordered FCCS to file an amended case plan. FCCS then placed V.B.-S. in a foster home.

{¶ 15} By August 2011, both V.B.-S. and his foster parents expressed interest in V.B.-S. being adopted by the foster parents. In the amended case plan, filed September 1, 2011, FCCS addressed the issue of V.B.-S.'s visitation with Mother. The plan contemplated that V.B.-S. would visit Mother at the agency at least once a week for one hour. The plan observed, however, that V.B.-S. was extremely fearful of Mother and refused to have any

contact with her. In addressing the appropriateness of his placement, FCCS observed that V.B.-S. visibly shook when discussing the possibility of having contact with his mother.

{¶ 16} On September 16, 2011, a psychologist, Dr. Pawlacrzyk, completed a psychological examination of V.B.-S. and diagnosed him as suffering from depressive disorder and oppositional defiant disorder. On December 2, 2011, Dr. Pawlacrzyk, who had also conducted psychological evaluations of Mother, submitted an addendum to his earlier report. In it, he expressed his opinion that V.B.-S. should gradually increase the amount of time spent with his mother in an effort to reunify the family.

{¶ 17} In October 2011, V.B.-S. agreed to visit with Mother for the purpose of informing her that he wanted to be adopted. The visit took place in an office setting, at which the caseworker, his foster father, and his counselor were present. Mother was accompanied by her counselor and an interpreter. The guardian ad litem also attended the meeting. After the meeting, the caseworker reported that V.B.-S. told Mother that he wanted to be adopted, was very cold toward her, and barely looked at her. V.B.-S. spoke to Mother only through his counselor. He did, however, at the end of the visit, hug Mother and agree to visit her and his siblings the following week.

{¶ 18} A visit did take place the following week, but the caseworker again reported that V.B.-S. refused to participate unless his foster family, his caseworker, and his counselor were all in the room. V.B.-S. had very little interaction with Mother or two of his siblings. However, he did engage with one of the three children and hugged Mother at the end of the visit. He stated that he wanted to visit the following week as well. The foster parents, however, reported that V.B.-S. appeared nervous prior to these visits and told them he only participated in the visits because he did not want to upset Mother. He also wrote a letter to Mother asking her to "get out of my life."

{¶ 19} In November 2011, FCCS scheduled additional bi-weekly visitations to begin the week of December 13, 2011. However, V.B.-S. refused to participate in them, and the parties have stipulated that no visits between V.B.-S. and Mother took place after December 2011. The parties have further stipulated that, in December 2011, V.B.-S. stated that he would kill himself if he was forced to go home to Mother. He stated that he had a plan on how he would accomplish this but would not divulge the plan because he knew he

would be prevented from proceeding with his plan.  He further stated that he considered the prior visits to be "good-bye visits" and that he never wanted to see Mother again.

{¶ 20} The parties have stipulated that Mother has completed a majority of her case plan obligations, including attending and participating in anger management classes, parenting classes, and individual counseling. However, Mother is unable to complete family counseling—a requirement of the court-approved case plan—because V.B.-S.'s counselor determined that it would be inappropriate to require him to participate in family counseling.  The parties have also stipulated that her home is adequate and free of hazards. In addition, Mother meets the basic needs of her other children in her home.

{¶ 21} On January 30, 2012, FCCS moved the court for an order awarding permanent custody of V.B.-S., who was then age 13, to FCCS.  FCCS alleged that either V.B.-S. could not be placed with either parent within a reasonable period of time or he should not be placed with his parents. The agency also alleged that it would be in the best interest of V.B.-S. for the agency to obtain permanent custody of him.

{¶ 22} On September 24, 2012, FCCS filed an amended motion for permanent custody. It noted that V.B.-S. had, as of the time of the amended motion, been in the temporary custody of FCCS for 14 months.

{¶ 23} On September 25, 2012, the guardian ad litem filed a report noting that the agency "is clearly at an impasse in this case and in order to achieve permanency [it has] no choice [but] to seek permanent custody."  (Sept. 25, 2012 Guardian Ad Litem ("GAL") report.)  The GAL observed that both of V.B.-S's foster parents wanted to adopt him but were also willing to keep him through a grant of legal custody or through a planned permanent living arrangement ("PPLA").  The GAL further reported that V.B.-S. had told him that he did not want to see Mother or his siblings.

{¶ 24} On October 18, 2012, FCCS filed another semi-annual administrative review ("SAR"). It noted that V.B.-S. had made progress in school and was managing his emotional behaviors.  He remained in counseling and "ha[d] made progress in every area except in his willingness to have contact with his mother."  (Oct. 18, 2012 SAR, 3.)  The agency further reported that his psychologist continued to recommend that V.B.-S. not have any contact with Mother.

{¶ 25} On March 19, 2013, the GAL filed another report, observing that, although he "was initially in favor [of] reunification and believed it was in [V.B.-S.'s] best interest to be reunited with his Mother," he had come to believe that "reunification cannot take place." (Mar. 19, 2013 GAL Report, 2.) He noted that V.B.-S.'s psychologist had concluded that it would not be in the child's best interest to reunify with Mother. The GAL further observed that the child was in a good placement with caring foster parents. The GAL supported an award of permanent custody because "at this point in time there is no other alternative. [V.B.-S.] refuses to visit or see his mother and whether it is justified by past allegations of abuse, he does seem to have a genuine fear in reunifying with her." (Mar. 19, 2013 GAL report, 3.)

{¶ 26} On March 19, 2013 the trial court conducted an evidentiary hearing of FCCS's motion for permanent custody. The court conducted an in camera interview of V.B.-S., during which V.B.-S. stated that he did not want to live with Mother.

{¶ 27} At the hearing, counselor Guhl testified that the initial treatment goals of counseling included decreasing V.B.-S.'s depression and anxiety, helping him to improve his relationship with Mother, and reducing his negative behaviors. She testified that she had also counseled Mother and had suggested that Mother write letters to V.B.-S. and send him photographs to encourage V.B.-S. to enter into a relationship with her. But Guhl also testified that, in the beginning, V.B.-S. was unwilling to even have phone contact with Mother. She testified that V.B.-S.was never able to resolve his past trauma with Mother and would "shut down" whenever she brought up his relationship with Mother.

{¶ 28} After the few visits that did occur, Guhl reported a regression in V.B.-S.'s behavior. She testified that "Children Services was trying to encourage the visits to keep going because [V.B.-S.] was a little ambivalent in the visits." (Tr. 46.) But V.B.-S. was angry after the visits and told the counselor that he had not really wanted to participate in them. Guhl noted that, on several occasions, V.B.-S. refused to get into the car to go to the scheduled visits. She testified that he never felt safe during visitations with Mother and was shy, nervous, and frightened during them. She also reported that V.B.-S. consistently said he was afraid of Mother, despite the letters and photographs Mother had sent, and stated he feared that, even if the visitation went well, things would change if he went home. Guhl described V.B.-S. as a severely traumatized child. She expressed her opinion that Mother

was not capable of meeting V.B.-S.'s mental health needs and that Mother had never acknowledged the extent of the abuse suffered by V.B.-S. The trial court also accepted into evidence a January 6, 2012 letter from counselor Guhl to FCCS, in which she had again reiterated that visitation was not in V.B-S.'s best interest.

{¶ 29} FCCS caseworker, Rebecca Van Overloop, also testified at the hearing. She stated that she had been the family's caseworker since January 31, 2012; she had not observed a bond between V.B.-S. and Mother during that time; and V.B.-S. had shown no willingness to reunify with Mother. She felt that V.B.-S. was bonded with his foster parents.

{¶ 30} In its April 2013 SAR, the agency reported that V.B.-S. remained in counseling and continued to take medication. V.B.-S. continued to assert that he did not want to have a relationship with Mother. The agency reported that the child was doing well in his foster home and was doing better at school, although he had had been diagnosed as suffering from post-traumatic stress disorder.

{¶ 31} On May 8, 2013, the trial court entered its decision. It accepted the parties' stipulation that V.B.-S.'s putative father, or fathers, had abandoned the child. The court found that clear and convincing evidence existed that it was in V.B.-S.'s best interest that his custody be awarded to FCCS; it would be contrary to his best interest to live with Mother; V.B.-S. had been in the temporary custody of FCCS for more than 12 months of a consecutive 22-month period; and FCCS had made reasonable efforts to eliminate the need for removal of V.B.-S. from Mother's home. The court further found that reasonable efforts had been made to finalize the permanency plan in effect for V.B.-S.

## II. ASSIGNMENTS OF ERROR

{¶ 32} Mother has raised two assignments of error, as follows:

> [1.] THE TRIAL COURT ERRED WHEN IT GRANTED THE MOTION FOR PERMANENT CUSTODY WHEN THE AGENCY FAILED TO MAKE REASONABLE EFFORTS TO RETURN THE CHILD TO HIS HOME AND FAILED TO SEEK ANY MODIFICATION OF THE CASE PLAN REGARDING THIS REQUIREMENT.

> [2.] THE TRIAL COURT ERRED WHEN IT DETERMINED THAT IT WAS IN THE BEST INTEREST OF THE CHILD TO

GRANT PERMANENT CUSTODY WHEN THERE WAS NO
RECENT EVIDENCE THAT AN ADOPTION WAS LIKELY.

## III. LEGAL ANALYSIS

### A. *Legal Framework and Standard of Review*

{¶ 33} "The right to parent one's children is a fundamental right." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104,¶ 28, citing *Troxel v. Granville,* 530 U.S. 57, 66 (2000). Because that right is an essential and basic civil right "parents must receive every procedural and substantive protection the law permits." *In re D.C.*, 10th Dist. No. 08AP-1010, 2009-Ohio-2145, citing *In re Hayes*, 79 Ohio St.3d 46, 48, ¶ 8 (1997). However, the state has broad authority to intervene to protect children from abuse and neglect. *In re C.F.* at ¶ 28, citing R.C. 2151.01. An award of permanent custody, which terminates parental rights, is an "alternative of last resort and is only justified when it is necessary for the welfare of the children." *Id.*

{¶ 34} Pursuant to R.C. 2151.414(B)(1), a trial court may grant permanent custody of a child to an agency if the court determines, by clear and convincing evidence, that: (1) it is in the best interest of the child; and (2) one of the four factors set forth in R.C. 2151.414(B)(1) applies. The fourth factor described in R.C. 2151.414(B)(1) is that "[t]he child has been in the temporary custody of one or more public or private children services agencies for twelve or more months of a consecutive twenty-two-month period." R.C. 2151.414(B)(1)(d).

{¶ 35} In the case before us, the parties have stipulated that V.B.-S. has been in the custody of FCCS for more than 12 of the last 22 months. Accordingly, because the statutory factor set forth in R.C. 2151.414(B)(1)(d) had been established, the court was statutorily authorized to grant FCCS permanent custody of V.B.-S. if clear and convincing evidence existed that it was in V.B.-S.'s best interest to do so. Clear and convincing evidence is the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established." *In re D.C.* at ¶ 9, citing *In re Abram*, 10th Dist. No. 04AP-220, 2004-Ohio-5435. Clear and convincing evidence does not mean the evidence must be clear and unequivocal, nor does it require proof beyond a reasonable doubt. *Id.*

{¶ 36} In determining whether a grant of permanent custody to a public children services agency is in the child's best interest, the court must consider all relevant factors, including four that are specifically described in R.C. 2151.414(D)(a) through (d). Stated generally, those four factors are: (a) consideration of the child's interaction and interrelationship with other individuals identified in the statute; (b) the child's wishes; (c) the child's custodial history; and (d) the child's need for a legally secure permanent placement. Moreover, pursuant to R.C. 2151.414(C), in determining the best interest of a child, a court "shall not consider the effect the granting of permanent custody to the agency would have upon any parent of the child." *Accord In re G.P.*, 5th Dist. No. 2013CA00126, 2013-Ohio-4692, ¶ 43, citing *In re: Awkal,* 95 Ohio App.3d 309, 315 (8th Dist.1994). Similarly, R.C. 2151.414(C) prohibits a court from "deny[ing] an agency's motion for permanent custody solely because the agency failed to implement any particular aspect of the child's case plan."

{¶ 37} In addition, the Supreme Court of Ohio has determined that a court may not grant permanent custody of a child to a public children services agency unless the agency has demonstrated that it has made reasonable efforts to reunite the child with the child's parent or parents:

> [W]e hold that, except for some narrowly defined statutory exceptions,[1] the state must make reasonable efforts to reunify the family before terminating parental rights. If the agency has not already proven reasonable efforts, it must do so at the hearing on a motion for permanent custody. However, the specific requirement to make reasonable efforts that is set forth in R.C. 2151.419(A)(1) does not apply in an R.C. 2151.413 motion for permanent custody.

*In re C.F.* at ¶ 4.

{¶ 38} The Supreme Court in *In re C.F.* resolved a conflict that had existed in the courts of appeals on the issue "[w]hether a reasonable-efforts determination is required in motions for permanent custody filed pursuant to R.C. 2151.413." *Id. at* ¶ 20. It noted that

---

[1] The Supreme Court identified those exceptions as including cases where the parent from whom the child was removed has been convicted of or pleaded guilty to certain criminal offenses, has repeatedly withheld medical treatment or food from the child, has placed the child at substantial risk on more than one occasion because of alcohol or drug abuse, has abandoned the child, or has had parental rights involuntarily terminated with respect to a sibling of the child at issue. *In re C.F.* at ¶ 34.

some appellate courts had held that an agency must satisfy the R.C. 2151.419 reasonable-efforts requirement at the permanent custody hearing, while other courts had held that the statute does not apply in an R.C. 2151.41 permanent custody hearing. *Id.* The court looked to the text of R.C. 2151.419(A)(1) and discerned that the statute applied to hearings held pursuant to specifically enumerated sections of R.C. Chapter 2151.31 and that, in those types of statutory hearings, the court is required to "determine whether the * * * agency * * * has made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home." But a permanent custody hearing is not included in the list of sections enumerated in R.C. 2151.419(A)(1). The Supreme Court concluded that, "by its terms, R.C. 2151.419 applies only at hearings held pursuant to R.C. 2151.28, 2151.31(E), 2151.314, 2151.33, or 2151.353." *Id.* at ¶ 41. Accordingly, it found that R.C. 2151.419 "does not apply in an R.C. 2151.414 permanent-custody hearing." *Id.* at ¶ 38.

{¶ 39} The Supreme Court, nevertheless, determined that, "[b]ased on the constitutional implications of terminating parental rights and the importance of requiring reasonable reunifications efforts that pervades federal and Ohio law, the state must have made reasonable efforts to reunify the family prior to the termination of parental rights." *Id.* at ¶ 21. It reached this conclusion, despite the fact that R.C. 2151.419(A)(1) did not statutorily require a reasonable-efforts finding at a permanent custody hearing, stating "[t]his does not mean that the agency is relieved of the duty to make reasonable efforts." *Id.* at ¶ 42. Moreover, "[i]f the agency has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody then it must demonstrate such efforts at that time." *Accord In re K.L.*, 10th Dist. No. 13AP-218, 2013-Ohio-3499, ¶ 39 (quoting *In re C.F.* and observing that, although "the statute requiring reasonable efforts does not apply to motions for permanent custody brought pursuant to R.C. 2151.413, or to hearings held on such motions under R.C. 2151.414, * * * '[t]his does not mean that the agency is relieved of the duty to make reasonable efforts' * * * [and] 'if the agency has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time.' "). In *In re C.F.*, the Supreme Court noted that the record reflected that the trial court had made reasonable-efforts findings at numerous points during the course of the litigation

concerning C.F.'s status as a neglected child. Moreover, the court heard testimony at the permanent custody hearing that supported the finding that the agency had made reasonable efforts to reunify the family. The Supreme Court agreed that the agency had established that it had made reasonable efforts to reunify the family and affirmed the trial court's grant of permanent custody to the agency.

{¶ 40} Our standard of review of a judgment granting permanent custody of a child to a public children services agency is well-established. We will not reverse a trial court's determination in a permanent custody case unless it is against the manifest weight of the evidence. *In re M.E.V.,* 10th Dist. No. 08AP-1097, 2009-Ohio-2408, ¶ 10, citing *In re Andy–Jones,* 10th Dist. No. 03AP–1167, 2004–Ohio–3312, ¶ 28. "Judgments supported by some competent, credible evidence going to all essential elements of the case are not against the manifest weight of the evidence." *Id.* Moreover, we recognize that " '[t]he discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, giving the nature of the proceedings and the impact the court's determination will have on the lives of the parties concerned.' " *In re W.D.,* 10th Dist. No. 09AP-589, 2009-Ohio-6903, ¶ 34, quoting *In re A.D.,* 10th Dist. No. 08AP-238, 2008-Ohio-3626, ¶ 8.

### B. *Reasonable Efforts at Reunification*

{¶ 41} In her first assignment of error, Mother argues that the trial court erred in finding that the agency had made reasonable efforts to reunite V.B.-S. with Mother and siblings. On review, we therefore determine whether the trial court's determination was consistent with the manifest weight of the evidence. Although R.C. 2151.419(A)(1) is inapplicable to permanent custody hearings, the court nevertheless concluded, consistent with *In re C.F.,* that FCCS "ha[d] made reasonable efforts to prevent or eliminate the need for removal of [V.B.-S.] from [V.B.-S's] own home." (May 8, 2013 Entry, 15.) We conclude that the trial court's determination on this issue was not contrary to the manifest weight of the evidence.

{¶ 42} The term "reasonable efforts" is used to describe the state's efforts to " 'resolve the threat to the child before removing the child or to permit the child to return home after the threat is removed.' " *In re J.C.,* 10th Dist. No. 10AP-766, 2011-Ohio-715, ¶ 12, quoting *In re C.F.* at ¶ 28. In further elucidating the concept of "reasonable efforts" in

the context of child protection cases, other Ohio Courts of Appeals have adopted the premise that a reasonable effort is an "honest, purposeful effort, free of malice and the design to defraud or to seek an unconscionable advantage." *In re Weaver,* 79 Ohio App.3d 59, 66 (12th Dist.1992); *In re J.T.-W.,* 6th Dist. No. L-12-1353, 2013-Ohio-3901, ¶ 45; *In re R.P.,* 5th Dist. No. 2011AP050024, 2011-Ohio-5378, ¶ 46; *In re Bowers,* 7th Dist. No. 04 MA 216, 2005-Ohio-4376, ¶ 62; *In re A.U.,* 2d Dist. No. 22287, 2008-Ohio-187, ¶ 27.

{¶ 43} In the case before us, the evidence supports the conclusion that FCCS's actions were genuine attempts to facilitate a reunification of V.B.-S. with Mother.  It provided ongoing counseling services to both of them.  In fact, V.B.-S.'s counselor testified that FCCS recognized that V.B.-S. had acted somewhat ambivalent during the December 2011 visits that took place and that, as a result, FCCS thereafter encouraged further visits. But, despite having told Mother that he would meet with her again, V.B.-S. refused to get into the car to travel to subsequently scheduled visits.

{¶ 44} We have previously recognized that a child's refusal to participate in family counseling may preclude a parent from successfully satisfying a case plan requirement to complete family counseling. *In re Jenkins,* 10th Dist. No. 00AP-1411 (June 28, 2001) (affirming award of permanent custody of two children to FCCS where the 13-year-old daughter had consistently refused to do anything with her mother, including family counseling; and the 10-year-old son had not only physically resisted being transported to the visits but also suffered adverse physical reactions after the visits).  Moreover, V.B.-S.'s counselor and caseworker both testified that they had repeatedly encouraged V.B.-S. to participate in family counseling with Mother, but V.B.-S. regressed after the visits with Mother.  His counselor testified that demanding him to participate in additional visits was likely to negatively impact his mental health and potentially trigger additional post-traumatic stress and cause him to become suicidal.  Here, we find that reasonable efforts at reunification did not require the agency to force V.B.-S. to participate in parental visits where he adamantly refused to participate, despite having been encouraged to do so; his counselor advised against it; and prior visits were followed by adverse behavioral consequences, including threats of self-harm.

{¶ 45} Furthermore, the trial court concluded on at least two occasions prior to the hearing on the motion for permanent custody that FCCS had made reasonable efforts to

accomplish reunification. After the November 12, 2010, adjudicatory hearing, the court specifically found that "[c]ontinuation in the child's own home would be contrary to the child's welfare and that *reasonable efforts have been made to* prevent or *eliminate the need for removal of [V.B.-S.] from the child's own home.*" (Emphasis added.) (Nov. 19, 2010 Magistrate's Decision.) The same finding was made by the court on July 28, 2011 when it changed V.B.-S.'s custodial status by terminating Maria's temporary custody and awarding temporary custody to FCCS. In this order, the magistrate specifically observed that "[p]lacement and casework services were provided by the Agency to the family of the child, but the removal of the child from home continues to be necessary because the circumstances giving rise to the original filing have not been sufficiently alleviated." (July 28, 2011 Magistrate's Decision.) Moreover, the court in its permanent custody order also expressly found that "Franklin County Children Services has made reasonable efforts to prevent or eliminate the need for removal * * * [and that] [r]easonable efforts have also been made to finalize the permanency plan in effect for the child." (May 8, 2013 Decision, 15.)

{¶ 46} Accordingly, we find that FCCS, both prior to and during the evidentiary permanent custody hearing, established that it had made reasonable efforts to reunify V.B.-S. with Mother. *Accord In re K.L.,* 10th Dist. No. 13AP-218, 2013-Ohio-3499, ¶ 40; *In re W.D.,* 10th Dist. No. 09AP-589, 2009-Ohio-6903, ¶ 6-9; *In re J.C. at* ¶ 21-22. The court's repeated findings that FCCS had made reasonable efforts toward reunifying V.B.-S. and Mother were not contrary to the manifest weight of the evidence.

{¶ 47} Mother further argues that the agency should have moved the court to modify the case plan in light of V.S-B.'s continued refusal to visit Mother or participate in family counseling with her. However, we have recognized that, in determining whether FCCS has failed to make reasonable efforts to reunite a child with the child's parent, " '*the issue is not whether there was anything more that [the children's services agency] could have done,* but whether the agency's case planning and efforts were reasonable and diligent under the circumstances of this case.' " (Emphasis added.) *In re Ratliff,* 10th Dist. No. 04AP-803, 2005-Ohio-1301, quoting *In re Leveck,* 3d Dist. No. 5-02-52, 2003-Ohio-1269, ¶ 10. Similarly, other Ohio Courts of Appeals have observed that, "[i]n determining whether the agency made reasonable efforts to reunify the children with their parents, *the issue is not*

*whether the agency could have done more, but whether it did enough to satisfy the reasonableness standard under the statute.*" (Emphasis added.) *In re Townsend*, 4th Dist. No. 04CA46, 2005-Ohio-2473, ¶ 23. *Accord In re J.T.-W.* at ¶ 45; *In re C.M.*, 9th Dist. No. 24380, 2009-Ohio-943, ¶ 21. "Moreover, in making this determination, the health and safety of the child are paramount and the trial court is not required to deny a motion for permanent custody 'solely because the agency failed to implement any particular aspect of the child's case plan.' R.C. 2151.419(A)(1);R.C. 2151.414(C)." *In re Townsend* at ¶ 23.

{¶ 48} The agency's efforts to reunify V.B.-S. with Mother, although ultimately unsuccessful, were nevertheless reasonable. We therefore overrule Mother's argument contending that the trial court should have amended the case plan to require FCCS to make more effort toward reunification.

### C. *Alleged Error Relative to Likelihood of Adoption*

{¶ 49} In her second assignment of error, Mother argues that the trial court should not have granted FCCS permanent custody of V.B.-S. because there was no recent evidence that an adoption was likely.

{¶ 50} Initially, we note that the underlying premise of Mother's argument, i.e., that there was no recent evidence that V.B.-S was likely to be adopted, is not supported by the record. The FCCS caseworker was asked at the hearing whether V.B.-S. was in a foster-to-adopt home and whether the foster parents were interested in adoption. She replied in the affirmative and stated that the foster parents were "very interested in adoption." ( Tr. 82.) She described V.B.-S. as being bonded to the foster parents, as well as with the other children in the home. She testified that V.B.-S. had shown significant improvement since being placed in the foster home and stated that a grant of permanent custody to FCCS for the purposes of adoption was the best way to assure that V.B.-S. would be adopted into a stable permanent home. Her testimony, which was current at the time of the hearing, suggested that adoption of V.B.-S. was, in fact, likely. Moreover, V.B.-S. himself indicated to the court during in camera examination that he desired to be adopted by his foster parents.

{¶ 51} More significantly, however, is the fact that the statutes governing permanent custody simply do not require an agency to prove that adoption is likely. It is true that the likelihood that a child will be adopted may be considered in determining the child's best

interest. See R.C. 2151.414(D)(1)(d) ("In determining the best interest of a child, * * * the court shall consider * * * [t]he child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency."); *In re K.L.*; *In re K.J.D.*, 10th Dist. No. 12AP-652, 2013-Ohio-610, ¶ 32. But the statutes contemplate that all of the statutory best-interest factors must be considered and, although the likelihood of adoption weighs in favor of such an award, the absence of that likelihood does not preclude the court from finding that an award of permanent custody is in the child's best interest.

{¶ 52} This conclusion is consistent with the Supreme Court of Ohio's express recognition that "while a juvenile court reviewing a motion for permanent custody was at one time required to consider the child's probability of being adopted, * * * the current statutory framework does not expressly require the court to consider this information in making a best-interest determination." *In re T.R.*, 120 Ohio St.3d 136, 2008-Ohio-5219, ¶ 14. "While it certainly may be helpful for a court to know the agency's adoption plans, the court is not required to factor adoption possibilities into its analysis, and the agency will be bound to seek adoption for the child if permanent custody is granted regardless of whether the plans are filed before the motion is considered." *Id.* at ¶ 16.

{¶ 53} We therefore overrule Mother's second assignment of error.

## IV. CONCLUSION

{¶ 54} For the foregoing reasons, both of Mother's assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, is affirmed.

*Judgment affirmed.*

SADLER and McCORMAC, JJ., concur.

McCORMAC, J., retired, of the Tenth Appellate District, assigned to active duty under the authority of the Ohio Constitution, Article IV, Section 6(C).

_____