[Cite as *In re C.G.*, 2014-Ohio-279.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In re | : | |
| C.G. et al., | : | No. 13AP-632 |
| | | (C.P.C. No. 11JU-2638) |
| [J.G. | : | |
| | | (REGULAR CALENDAR) |
| Appellant]. | : | |
| In re | : | |
| C.G. et al., | : | No. 13AP-653 |
| | | (C.P.C. No. 11JU-2638) |
| [A.H. | : | |
| | | (REGULAR CALENDAR) |
| Appellant]. | : | |

D E C I S I O N

Rendered on January 28, 2014

*Robert J. McClaren*, for Franklin County Children Services.

*Peterson, Connors, Fergus & Peer LLP*, and *Zachary M. Swisher*, for appellant J.G.

*Giorgianni Law LLC¸* and *Paul Giorgianni*, for appellant A.H.

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

O'GRADY, J.

{¶ 1} In consolidated appeals, appellants, J.G. ("Father") and A.H. ("Mother"), appeal from a judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, granting permanent custody of their three minor

children to appellee, Franklin County Children Services ("FCCS"). For the following reasons, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} Mother and Father are not married and have three children together. C.G. was born in May 2008, J.P.G. was born in June 2009, and W.G. was born in July 2010. When C.G. was two months old, FCCS filed a dependency complaint due to concerns the parents were homeless and lacked baby supplies. FCCS had temporary custody of C.G. for about one year and four months. The parents regained custody for about one year before FCCS got temporary custody of all three children in this matter.

{¶ 3} On March 1, 2011, FCCS filed a complaint alleging the children were neglected and dependent. FCCS obtained temporary custody on March 7, 2011. After an adjudicatory hearing, a magistrate dismissed the neglect action at FCCS' request and adjudicated the children as dependent without objection from the parents. The trial court adopted the magistrate's decision on April 25, 2011. Subsequently, the court granted FCCS two extensions of temporary custody. On October 30, 2012, FCCS filed a motion for permanent custody. In May 2013, the trial court conducted a three-day hearing on the motion for which Mother was present but Father was not. Because both parents only challenge the termination of Mother's parental rights on appeal, our summary of this hearing will focus on evidence regarding Mother.

{¶ 4} At the hearing, Sherada Cannon, a family case manager with the National Youth Advocate Program ("NYAP"), testified her organization provides case management services for FCCS. Cannon assesses relationships between parents and children, prepares case plans for the families, and helps parents understand and complete the plan. She was assigned to this case in March 2011 and testified the children were removed because the family lived in a "filthy," one-bedroom apartment with "13 cats" and "10 litter boxes that were overflowing with feces." (May 7, 2013 Tr. 122.) The children were dirty, malnourished, and had been locked in a room while they slept.

{¶ 5} Under the case plan Cannon formulated, Mother was to complete a psychological assessment and follow the psychiatrist's recommendations (which included taking prescribed psychiatric medications), complete individual counseling, complete parenting classes and demonstrate the lessons learned, obtain and maintain safe housing

and a stable income, and have no more than two pets and keep them under control. Cannon testified Mother did not substantially complete the case plan.

{¶ 6}   According to Cannon, Mother did not consistently participate in individual counseling.  Mother's counseling provider terminated services at one point due to missed appointments.  Although Mother restarted counseling, she had only been compliant with her requirements since February 2013.  Cannon testified Mother needed to address anger issues.

{¶ 7}   Mother completed parenting classes but only minimally demonstrated the lessons she was supposed to learn.  During visitation with the children, she did not physically engage with them even when there were safety concerns.  One time W.G. wandered into a parking lot by himself.  Mother often directed the children "from a distance" while seated.  (May 7, 2013 Tr. 136.)  She also did not appear to understand the children's developmental delays, even with explanations from psychologists and counselors.  She let a convicted murderer live with her knowing that would hinder reunification with the children.

{¶ 8}   Cannon thought the parents had two evictions since the case began.  At the time of the hearing, Mother lived with S.H., the children's maternal grandmother, on Eastmoreland Drive.  This home was cleaner than the one from which FCCS took the children, but Mother had not consistently maintained its cleanliness.  Cannon also testified Mother and S.H. have a volatile relationship.  Cannon had to exclude S.H. from visitation due to frequent arguments S.H. and the parents had in front of the children.  Less than two weeks before the hearing, S.H. indicated she might ask Mother to move out.  Also, Mother told Cannon that S.H. sent her a text message stating she wished Mother was dead.

{¶ 9}   Cannon testified to her knowledge, Mother has never had a steady a job.  At the time of the hearing, Mother had not provided Cannon with verification of any current employment.

{¶ 10} According to Cannon, despite the role the cats played in the children's removal, the parents were resistant to getting rid of them.  Also, up until three weeks before the hearing, Mother had two dogs.  Two and one-half weeks before the hearing there was still an overwhelming animal odor in the home.  The family's animals harmed

the guardian ad litem ("GAL") and S.H.  The animals' presence prevented visitation between the parents and children in the home.  Cannon also testified a placement with S.H. and a maternal great uncle failed after less than one month because a family dog attacked J.P.G., and the uncle told Cannon they wanted to keep the dog instead of the children.

{¶ 11} Mother did not complete the portion of the case plan that required she take her prescribed medication.  As of the first day of the permanent custody hearing, Mother was not taking her medication even though NYAP offered financial assistance.

{¶ 12} Mother visited the children on a regular basis, and Cannon thought they bonded with her.  But the children had been in their current foster home since October 2011 and bonded with their foster family too.  The foster parents expressed a desire to adopt all three children, and Cannon testified they met the children's basic needs and were nurturing and attentive.  When FCCS took custody, the children were not on target developmentally but had since improved, which she attributed to their changed environment and regular therapy.

{¶ 13} Hollie Street, a NYAP treatment advocate home base worker, worked with the family since October 2012.  At the parents' first home she visited, Street saw gnats flying around dishes in the sink and garbage bags of dirty clothes.  The home lacked working gas and electric at various times, and the parents could not sleep in the bedroom due to a bug infestation.  Street testified the utilities and rent were consistently paid for Mother's home at the time of the hearing, but S.H. paid the bills.  Street acknowledged efforts Mother made to child-proof the home, but testified hazardous chemicals were repeatedly left within the reach of children.  Windows lacked screens, the hand rail on the staircase was loose, and one of the stairs was smaller than the others, creating a trip hazard.  Street acknowledged some improvement in cleanliness but regularly observed clutter on tables.  During a home visit in January 2013, Street observed S.H. sitting with a dog in her lap and wiping blood off of her arm.

{¶ 14} On January 9, 2013, Mother told Street that Father had moved out.  On February 1, 2013, Father told Street he intended to return after Mom got the children back.  When Street went to Mother's home a week later, Father answered the door; but two weeks later, Mother claimed he was moving in with a new girlfriend.

{¶ 15} Cassandra Fletcher, a parent coach at NYAP, testified Mother participated in two service periods of parenting classes. The first service period was terminated due to excessive absences. Mother completed the second period but still had a lot of absences. Despite Mother's completion of 11 of 49 classes during the first service period, her scores on the initial assessment for the second period were worse than her scores on the assessment for the first period. Fletcher acknowledged Mother was more engaged in lessons when Father was not present. In the final assessment, Mother only demonstrated mixed improvement. She did not understand the children's development delays. Fletcher gave Mother lessons on milestones children should reach at certain ages. Mother reported her children reached milestones they had not. She thought the children "did just fine" in her home and any problems stemmed from their removal. (May 13, 2013 Tr. 44.) Fletcher expressed concern that Mother would place unrealistic expectations on the children and not get them needed help.

{¶ 16} Tawana Lawrie, the children's GAL, testified she went to Mother's home in January 2013, and one of the dogs latched onto Lawrie's face and injured her lip. When Lawrie suggested the dog was a hazard to the children, Mother claimed he was " 'just hyper' " and would " 'be okay.' " (May 13, 2013 Tr. 86.) Lawrie also testified J.P.G. and W.G. were too young to express their wishes, but, in March 2013, C.G. told Lawrie she wanted to stay in her foster home. Lawrie recommended the court grant FCCS permanent custody because the parents had not completed the case plan and the children needed permanency and stability.

{¶ 17} When Mother testified regarding the children's removal, she admitted the family had shared a one-bedroom apartment with multiple cats. She admitted the home and children were dirty and the children seemed hungry but suggested they only missed one bath and meal, which she thought Father had provided. Mother claimed she did not notice Father locked the children in a room.

{¶ 18} Mother admitted she had to sign up for parenting classes twice because she missed too many classes the first time around. Mother claimed to have missed no classes the second time and believed the classes helped her. She regretted her decision to let a convicted murderer live with her. In addition, Mother testified J.P.G. had "some delays"

but was not sure of their nature. (May 13, 2013 Tr. 136.) She thought C.G. and W.G. had no delays at the time of the hearing.

{¶ 19} In addition, Mother testified she lived on East Main Street from January 2009 until her and Father's eviction in October 2011. They stayed "in an old RV for about three weeks" then moved to Chesterfield Road until late 2012. (May 7, 2013 Tr. 41.) Mother admitted the Chesterfield home frequently had bugs in the kitchen, and bugs in the bedroom forced them to sleep in the living room. She claimed they moved out due to roof and electrical problems, not an eviction.

{¶ 20} Mother signed a lease for a home on Eastmoreland Drive for November 15, 2012 to November 15, 2013. NYAP helped pay the deposit. Mother planned to just live there with S.H., but Father also moved in against Mother's wishes. Mother testified her relationship with Father lasted almost nine years. She tried to end the relationship many times but he "just refused to go." (May 7, 2013 Tr. 17.) They did break up in January 2013, so, at the time of the hearing, Mother just lived with S.H. Mother claimed with Father gone, they mostly kept up with the chores and baby-proofed the home. She admitted S.H. was paying the bills with disability income. Mother testified she and S.H. "might nitpick once in [awhile] but that's about as far as it goes." (May 7, 2013 Tr. 47.) Mother admitted S.H. sent texts wishing Mother was dead. But Mother knew "deep down" S.H. would never kick her or the children out. (May 7, 2013 Tr. 48.)

{¶ 21} Mother dropped out of high school after 11th grade. She had a job in 2006 or 2007, but did not work again until October 2012. Nationwide Arena employed her from October 2012 to February 2013, but she did no actual work during that time span. From October to December 2012, she also had a seasonal "side job." (May 7, 2013 Tr. 57.) Mother claimed she got a new job about two weeks before the hearing but still had paperwork to complete.

{¶ 22} Mother believed Father was "a big thing" holding her back, and her physical and emotional well-being improved without him. (May 7, 2013 Tr. 78.) After he left, she went to counseling, resolved anger issues, lost weight, and enrolled at Columbus State to attain her G.E.D. and become a veterinary assistant.

{¶ 23} Mother testified she stopped taking certain medication in June 2012 because she could not afford it. She obtained a prescription for anti-anxiety medication

the Thursday before the permanent custody hearing began but had not taken it yet as of the first hearing date because she was waiting for NYAP to pay for it.

{¶ 24} Mother claimed she got rid of her cats the same day FCCS took the children. Mother suggested Street saw S.H.'s arm bleeding not because one of Mother's dogs attacked her but because S.H. was on a blood thinner and would bleed even if the dog climbed on her. Mother admitted her first Craig's List ad for her dogs only sought a six month foster home for them, but claimed she later sought and found a permanent home for the dogs. At the time of the hearing, Mother had three fish and a snail, and she claimed to have no plans to get more pets.

{¶ 25} The trial court granted FCCS permanent custody of the children on July 3, 2013.

## II. ASSIGNMENT OF ERROR

{¶ 26} Mother appeals and presents this court with one assignment of error for our review:

> With respect to both the sufficiency of the evidence and the manifest weight of the evidence, FCCS failed to prove that terminating Mother's parental rights at this time is in the best interest of the children.

We granted Father's motion to join in Mother's appellate briefs.

## III. DISCUSSION

{¶ 27} In the sole assignment of error, the parents contend with respect to the sufficiency and manifest weight of the evidence, FCCS failed to prove terminating Mother's parental rights was in the best interest of the children at this time.

{¶ 28} "The right to parent one's children is a fundamental right." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 28, citing *Troxel v. Granville*, 530 U.S. 57, 66 (2000), and *In re Hayes*, 79 Ohio St.3d 46, 48 (1997). "Permanent termination of parental rights has been described as 'the family law equivalent of the death penalty in a criminal case.' " *Hayes* at 48, quoting *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist.1991). "Because an award of permanent custody is the most drastic disposition available under the law, it is an alternative of last resort and is only justified when it is necessary for the welfare of the children." *In re Swisher*, 10th Dist. No. 02AP-1408, 2003-Ohio-5446, ¶ 26, citing *In re*

*Cunningham*, 59 Ohio St.2d 100, 105 (1979).  Accordingly, " 'parents must receive every procedural and substantive protection the law permits.' "  *In re V.B.-S*, 10th Dist. No. 13AP-478, 2013-Ohio-5448, ¶ 33, quoting *In re D.C.*, 10th Dist. No. 08AP-1010, 2009-Ohio-2145, ¶ 8.

{¶ 29} R.C. 2151.414 governs the procedure for granting permanent custody of a child to an agency such as FCCS.  Under R.C. 2151.414(B)(1), a trial court may grant permanent custody to an agency if the court determines, by clear and convincing evidence, that: (1) it is in the best interest of the child, and (2) one of the situations set forth in R.C. 2151.414(B)(1)(a) through (d) applies.  Clear and convincing evidence is " 'that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.' "  *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, ¶ 42, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶ 30} In determining whether the trial court's ruling on the permanent custody motion is against the manifest weight of the evidence, we must consider whether the evidence on each element of the agency's case "satisfied or failed to satisfy the burden of persuasion," i.e., whether clear and convincing evidence supports each element.  *See Sparre v. Ohio Dept. of Transp.*, 10th Dist. No. 12AP-381, 2013-Ohio-4153, ¶ 11, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 19.  A judgment " 'supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence.' "  *Id.* at ¶ 10, quoting *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978), syllabus.  " 'The phrase "some competent, credible evidence" * * * presupposes evidentiary weighing by an appellate court to determine whether the evidence *is* competent and credible.' " (Emphasis sic.)  *Id.*, quoting *Eastley* at ¶ 15.

{¶ 31} " 'Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. * * * Weight is not a question of mathematics, but depends on [the evidence's] effect in inducing belief." ' "  (Emphasis deleted.)  *Eastley* at ¶ 12, quoting *State v. Thompkins*, 78

Ohio St.3d 380, 387 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed.1990). "Thus, in reviewing a judgment under the manifest-weight standard, a court of appeals weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way." *Sparre* at ¶ 10, citing *Eastley* at ¶ 20.

{¶ 32} "In undertaking this limited reweighing of the evidence, however, we are guided by the presumption that the factual findings of the trial court were correct." *Sparre* at ¶ 12. "Accordingly, the weight to be given the evidence and the credibility of the witnesses are primarily questions to be answered by the trier of fact." *Id.*, citing *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. The rationale for this deference is the trier of fact is in the best position to view witnesses and observe their demeanor, voice inflections, and gestures. *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). Moreover, though sufficiency and manifest weight are different legal concepts, a finding that a judgment is supported by the manifest weight of the evidence necessarily includes a finding that sufficient evidence supports the judgment. *See State v. Howze,* 10th Dist. No. 13AP-386, 2013-Ohio-4800, ¶ 10.

{¶ 33} Here, the parties agree the trial court correctly found clear and convincing evidence establishes the situation described in R.C. 2151.414(B)(1)(d) supports the permanent custody award. In other words, the evidence shows the children were in the temporary custody of one or more public or private children services agencies for 12 or more months of a consecutive 22-month period. R.C. 2151.414(B)(1)(d). Therefore, the trial court was statutorily authorized to grant FCCS permanent custody if clear and convincing evidence existed that it was in the children's best interest to do so.

{¶ 34} In determining whether a grant of permanent custody to a public children services agency is in a child's best interest, the court must consider all relevant factors, including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of [R.C. 2151.414] apply in relation to the parents and child.

R.C. 2151.414(D)(1).

{¶ 35} Here, the court made findings with regard to each enumerated best interest factor. The parents contend FCCS failed to prove termination of Mother's parental rights was in the children's best interest "at this time" but do not challenge any of the trial court's specific findings on the best interest factors. (Appellant's brief, 10.) Instead, they argue Mother's "domestic situation changed substantially in the four months leading up to the hearing," primarily due to Father's departure in January 2013. (Appellant's brief, 10.) They complain the trial court's opinion is "silent" about Mother's "improved behavior and outlook." (Appellant's brief, 11.) They argue the trial court should have given Mother "another six months and only then determined whether the best interests of the [c]hildren would be better served by terminating her parental rights as opposed to reuniting the [c]hildren with her." (Appellant's brief, 10-11.)

{¶ 36} In their reply brief, the parents clarify they do not believe the court should have extended temporary custody six more months and reserved judgment on the best interest issue. Instead, they argue the trial court should have found a grant of permanent

custody was not in the children's best interest and dismissed the complaint. FCCS would be "free to file a new complaint," obtain a new temporary custody order, and file a new motion for permanent custody. (Reply brief, 3.) The parents suggest the time it would take for FCCS to go through this process would be sufficient time for Mother to fully demonstrate her ability to raise the children without Father's negative presence.

{¶ 37} As FCCS points out, the parents' best interest argument suggests Mother's change in her domestic situation is entitled to more weight than any other factor in the best interest analysis. However, R.C. 2151.414(D) does not give any one factor "greater weight than the others." *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, ¶ 56. Moreover, even if the trial court believed Father is out of Mother's life permanently, which some evidence suggests he is not, the trial court's findings imply it was not persuaded Father's departure did or could cure Mother's parenting deficiencies.

{¶ 38} Mother had over two years to complete the case plan and fix the problems that led to the children's removal but failed to do so. As the trial court found, Mother did not successfully complete counseling. In addition, the trial court found Mother did not improve her parenting skills at visitation despite the fact she completed parenting classes. Cannon's testimony that Mother did not engage with the children during visitation, even when safety concerns were present, supports this finding.

{¶ 39} The trial court also found Mother did not establish stable employment or housing and was "very definitely unlikely" to do so "in the foreseeable future." (R. 264 Judgment Entry, 8.) Mother lived in four places during the pendency of this case—the East Main Street home from which she was evicted, the Chesterfield home infested with bugs and lacking proper utilities, an RV, and most recently the Eastmoreland home. She let a convicted murderer live in one of these homes. Mother shared the Eastmoreland home with S.H. and was dependent on S.H.'s income to pay the bills. Although Mother was 30 years old at the time of the hearing, it appears she has never had steady employment. She had no verified employment at the time of the hearing. FCCS presented evidence Mother and S.H. had a volatile relationship, and S.H. recently threatened to kick Mother out. In addition, FCCS already unsuccessfully placed the children with S.H. and a maternal great uncle. Although S.H.'s level of responsibility for

this failed placement is unclear, the fact that a dog attacked J.P.G. during the placement calls into doubt S.H.'s ability to assist with the children. Moreover, even after Father moved out, Mother's home was cluttered and had physical safety issues, such as a loose handrail on a staircase.

{¶ 40} Although not mentioned by the trial court, FCCS also presented evidence that Mother failed to consistently take psychiatric medication. Additionally, her love of animals and inability to control them contributed to the children's removal and interfered with reunification. For instance, after Father's departure, Mother kept a dog for several months after it attacked the GAL. Mother minimized this attack and an apparent attack on S.H. Mother admitted she posted an ad seeking a six-month foster home for her dogs, making her claim that she only planned to have fish and a snail as pets in the future suspect.

{¶ 41} The trial court also found the children "are special needs with a need for extensive attention, nurturing and stimulation that far exceeds the [parents'] very limited ability to meet the most basic needs of these three children." (Judgment Entry, 3.) The trial court found "[n]o amount of education, mentoring or tutoring" would help the parents become qualified to meet the children's "extraordinary custodial needs." (Judgment Entry, 3.) Cannon testified the children had developmental delays Mother did not seem to understand even though counselors and psychiatrists tried to explain them. Mother claimed the only child with delays at the time of the custody hearing was J.P.G., but she did not know the exact nature of those delays. Fletcher testified Mother had unrealistic beliefs about milestones the children had reached and might not get them needed help.

{¶ 42} At the time of the permanent custody hearing, the children had spent over half their lives in FCCS' custody and lived with the same foster parents since October 2011, i.e., for over one and one-half years. The trial court found the children had some bond with Mother but had a stronger bond with the foster parents. FCCS presented evidence the foster parents meet the children's basic needs and nurture them. The children's developmental delays improved in foster care. As the trial court found, C.G. expressed her desire to stay with her foster parents. The GAL supported the permanent custody motion. The trial court found the children needed a legally secure permanent

placement that could not be achieved without a grant of permanent custody to FCCS. The fact that the foster parents have expressed a desire to adopt the children suggests FCCS has already found the children a safe, permanent home.

{¶ 43} Reviewing the record as a whole, we cannot say the trial court clearly lost its way and the evidence weighs heavily against the trial court's best interest finding. The limited progress Mother made on the case plan and her optimism about her future prospects without Father did not compel the trial court to deny FCCS' motion for permanent custody. We find clear and convincing evidence supports the trial court's finding that it was in the children's best interest to grant FCCS permanent custody. The trial court's judgment awarding FCCS permanent custody is not against the manifest weight, so sufficient evidence necessarily supports it.

## IV. CONCLUSION

{¶ 44} Accordingly, we overrule the sole assignment of error and affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgment affirmed.*

SADLER, P.J., and DORRIAN, J., concur.

———————————