[Cite as *In re L.B.*, 2020-Ohio-3045.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In re: [L.B.], | : | |
| | : | No. 19AP-644 |
| | | (C.P.C. No. 18JU-12912) |
| [C.R. Mother, | : | |
| | | (ACCELERATED CALENDAR) |
| Appellant]. | : | |
| In re: [L.R.], | : | |
| | : | No. 19AP-645 |
| | | (C.P.C. No. 17JU-10301) |
| [C.R. Mother, | : | |
| | | (ACCELERATED CALENDAR) |
| Appellant]. | : | |

D E C I S I O N

Rendered on May 21, 2020

**On brief:** *Robert J. McClaren*, for appellee Franklin County Children Services.

**On brief:** *Yeura R. Venters*, Public Defender, and *Ian J. Jones*, for appellant.

APPEALS from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

DORRIAN, J.

{¶ 1} Appellant, C.R. ("mother"), appeals from judgments of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, terminating her parental rights and granting permanent custody of her minor children, L.R., also known as

L.B. ("L.R."), and L.B. (collectively, "the children"), to Franklin County Children Services ("FCCS").[1] For the following reasons, we affirm.

## I. Facts and Procedural History

## A. Proceedings Related to Custody of L.R.

{¶ 2} On May 23, 2017, FCCS filed a complaint asserting L.R. was an abused, neglected, and dependent child. On May 30, 2017, a magistrate of the juvenile court issued an order granting temporary custody of L.R. to FCCS and requiring mother to comply with supervised visits and alcohol and drug assessments and random screenings.

{¶ 3} FCCS refiled its complaint on August 18, 2017, asserting L.R. was an abused, neglected, and dependent child. The complaint set forth five causes of action: abused child pursuant to R.C. 2151.031(C), abused child pursuant to R.C. 2151.031(D), neglected child pursuant to R.C. 2151.03(A)(2), dependent child pursuant to R.C. 2151.04(C), and dependent child pursuant to R.C. 2151.04(D)(1) and (2). On August 21, 2017, a magistrate of the juvenile court issued an order granting temporary custody of L.R. to FCCS and requiring mother and father to comply with supervised visits, alcohol and drug assessments, recommendations, and random screenings.

{¶ 4} A magistrate of the juvenile court issued a decision effective October 18, 2017, finding L.R. to be an abused minor, pursuant to R.C. 2151.031(C), and dismissing the other claims in the complaint. The magistrate terminated the prior temporary custody order and committed L.R. to the temporary custody of FCCS. A case plan was filed on November 6, 2017; among other provisions, it required mother to refrain from using drugs, complete an alcohol and other drug assessment, link with an alcohol and other drug counselor, attend alcohol and other drug programming, participate in drug screening through American Court Services, maintain stable housing, and have stable, legal income.

{¶ 5} On April 26, 2018, FCCS moved for permanent custody of L.R., asserting mother failed to comply with her case plan and permanent custody was in L.R.'s best interest. The hearing on FCCS's motion was ultimately continued until January 2019 and combined with the hearing on FCCS's complaint for permanent custody of L.B.

---

[1] The parental rights of the children's father, L.B. ("father"), were also terminated by those decisions. Father did not contest the grant of permanent custody and has not appealed from the decisions.

**B. Proceedings Related to Custody of L.B.**

{¶ 6}    On May 23, 2018, FCCS filed a complaint seeking permanent custody of L.B., asserting he was an abused, neglected, and dependent child. On May 24, 2018, a magistrate of the juvenile court issued an order granting temporary custody of L.B. to FCCS. On August 15, 2018, FCCS refiled its complaint seeking permanent custody of L.B., asserting he was an abused, neglected, and dependent child.  On August 16, 2018, a magistrate of the juvenile court issued an order granting temporary custody of L.B. to FCCS and requiring mother and father to comply with supervised visits.

{¶ 7}    FCCS refiled its complaint a second time on November 5, 2018, seeking permanent custody of L.B., asserting he was an abused, neglected, and dependent child. The complaint set forth five causes of action: abused child pursuant to R.C. 2151.031(C), abused child pursuant to R.C. 2151.031(D), neglected child pursuant to R.C. 2151.03(A)(2), dependent child pursuant to R.C. 2151.04(C), and dependent child pursuant to R.C. 2151.04(D)(1) and (2).  On November 7, 2018, a magistrate of the juvenile court issued an order granting temporary custody of L.B. to FCCS and requiring mother and father to comply with supervised visits and random drug screenings.

{¶ 8}    A magistrate of the juvenile court issued a decision effective January 8, 2019, finding L.B. to be a dependent minor pursuant to R.C. 2151.04(C), (D)(1), and (2), and dismissing the other claims in the complaint. The magistrate maintained the temporary order of custody of L.B. to FCCS.

**C. Hearing and Permanent Custody Decisions**

{¶ 9}    A magistrate of the juvenile court conducted a hearing on the requests for permanent custody of L.R. and L.B. on January 31, 2019.

{¶ 10}  Erinn Anderson, a caseworker with FCCS, testified she was the caseworker for mother and her children from 2011 through February 2017, and again from April through May 2018. Anderson testified mother has five older children in addition to L.R. and L.B., and did not have custody of any of those children at the time of the hearing.  FCCS initially became involved with mother due to a domestic violence incident with the father of one of her older children, and a positive drug test at birth for one of her older children. FCCS was granted permanent custody of three of mother's older children in 2016 and permanent custody of another one of her older children in 2017.  Anderson indicated the

custody proceedings involving L.R. and L.B. were opened because they each tested positive for drugs at birth. FCCS received temporary custody of L.R. on May 30, 2017, and he was in the agency's care continuously since that date. FCCS received temporary custody of L.B. on May 24, 2018, immediately upon leaving the hospital after his birth, and he was in the agency's care continuously since that date.

{¶ 11} Anderson testified the requirements of mother's case plan for L.R. were consistent with those of the case plan related to her older children. Under the case plan, mother was required to complete alcohol and other drug programming and drug screens, follow the recommendations of the alcohol and other drug programming, and obtain housing and a stable, legal income. Anderson testified mother had been involved in multiple alcohol and other drug programs, but had not successfully completed any of those programs. Mother had not completed an alcohol and other drug assessment while the cases involving L.R. and L.B. were pending. Anderson testified mother was required to complete drug screenings through American Court Services; although she completed some screenings, mother was not consistent in doing so. Anderson testified mother admitted to prior use of heroin, marijuana, and oxycodone. At the time Anderson stopped serving as mother's caseworker, mother had not completed the requirements to satisfy the alcohol and other drug treatment and screening portions of her case plan. Anderson testified mother did not consistently have stable housing or employment during the time she served as mother's caseworker. Anderson further testified mother's visitations with L.R. and L.B. were inconsistent and included gaps of more than 90 days between visits. Anderson testified she did not observe mother's visitations with L.R. or L.B.

{¶ 12} Anderson indicated FCCS considered whether placement of the children with their maternal grandmother was possible, but found that location unacceptable due to drug use and domestic violence issues. One of mother's older children had been removed from the maternal grandmother's residence due to those same issues. L.R. and L.B. were placed into foster care in a home where three of their siblings had been adopted; the foster parents were also interested in adopting L.R. and L.B. Anderson testified there was a bond between the children and the foster parents, and the older siblings appeared to be bonded with L.R. and L.B.

{¶ 13} Rochelle Gallagher, another caseworker with FCCS, testified she became mother's caseworker in July 2018. Gallagher testified mother was linked with OhioGuideStone for drug screening when she took over the case, but would not sign the appropriate releases for FCCS to obtain screening results from OhioGuideStone. Mother was discharged from treatment services with OhioGuideStone for non-compliance. Mother did not link with another drug treatment provider after being discharged by OhioGuideStone. Gallagher testified mother believed she had completed treatment, but Gallagher indicated mother needed to reconnect with treatment services because she overdosed on heroin in September 2018. Mother told Gallagher she was also stabbed during the overdose incident. Gallagher testified mother was not compliant with drug screenings; in August 2018, mother had a positive drug screen for marijuana. Gallagher also observed indications of marijuana use during visits to mother's residence. Accordingly, Gallagher testified mother had not satisfied the alcohol and other drug screening or treatment requirements under her case plan.

{¶ 14} During Gallagher's time as caseworker, mother lived with friends and with the children's maternal grandmother. Gallagher indicated there may have been complications arising from mother's presence in the maternal grandmother's apartment. Gallagher also testified there were concerns about marijuana use by the children's maternal grandparents. Gallagher indicated mother started a new job in December 2018, but had not demonstrated a consistent employment history.

{¶ 15} Gallagher testified mother was not consistent in attending visitations with L.R. and L.B., and there were gaps of 90 days or more in the visits at times. Gallagher indicated the last time mother visited with the children was in September 2018. Gallagher did not observe any of mother's visitations with the children because of mother's inconsistency in attending visitation appointments. Gallagher testified mother had not substantially completed any part of her case plan.

{¶ 16} Gallagher observed L.R. and L.B. with their foster family, and testified the children were bonded with the foster parents. Similarly, the children were bonded with their three older siblings who had been adopted by the foster parents. The foster parents indicated a desire to adopt L.R. and L.B. Gallagher testified both L.R. and L.B. had been diagnosed with hypertonia and were receiving occupational and physical therapy for the

condition. Gallagher indicated L.B. was also receiving therapy related to extra digits on his hands. Both L.R. and L.B. were also receiving speech therapy. Gallagher testified she believed granting permanent custody of the children to FCCS was in their best interest because they needed permanency and neither mother nor father would be capable of fulfilling that need.

{¶ 17} Tobi Fliegel, the guardian ad litem appointed for the children, testified she observed L.R. and L.B. with their foster parents, and indicated the children appeared to be bonded with their foster parents and with their siblings in the foster family. She also observed mother visiting with L.R. and L.B., and one of mother's older children, in August 2018. Fliegel testified she had no concerns with mother's interactions with the children, but noted that when L.R. hit his head going down a slide, it was his older sister that ran to care for him. Fliegel stated the children were too young to understand the custody proceedings or give any indication of their wishes regarding custody. Fliegel indicated mother showed certificates demonstrating completion of parenting classes, but failed to demonstrate implementation of the skills learned in those classes. Fliegel testified granting permanent custody of the children to FCCS was in their best interest because they needed permanency and neither mother or father could provide it.

{¶ 18} Mother testified at the hearing and claimed she participated in drug treatment and screening through OhioGuideStone and authorized access to her screening results for FCCS. Mother claimed L.B.'s positive drug test at birth was due to prescription suboxone and asserted she had provided evidence of her prescription to FCCS. Mother asserted she successfully completed various courses on skills, healing, anger management, and drug recovery and relapse prevention at Alvis House from April through August 2016. She testified she was participating in parenting classes and attempting to reconnect with alcohol and other drug treatment and mental health treatment services. Mother stated she was currently working for a temporary employment agency, and testified to various jobs she held while she was under the FCCS case plan. Mother claimed she participated in visits with the children; although she admitted there were gaps between her visits with the children, she claimed the longest gap was approximately 45 days. Mother stated she had last used marijuana one week before the hearing, but claimed she had not used heroin for a long time.

{¶ 19} At the close of the hearing, the magistrate announced he would grant permanent custody of L.R. and L.B. to FCCS.  On February 11, 2019, the magistrate issued written decisions, effective January 31, 2019, granting FCCS's requests for permanent custody of the children, finding it was in the best interest of the children to terminate the parental rights of mother and father and commit the children to the permanent custody of FCCS for purpose of adoption.  Mother filed objections to the magistrate's decisions.

{¶ 20} The juvenile court judge conducted a hearing on mother's objections on June 11, 2019.  On September 5, 2019, the juvenile court judge issued a decision overruling mother's objections and affirming the magistrate's decision regarding L.B. On September 9, 2019, the juvenile court judge issued a decision overruling mother's objections and affirming the magistrate's decision regarding L.R.  In those decisions, the trial court concluded reasonable efforts had been made to prevent removing L.R. and L.B. from mother's care, but she failed to complete her case plan.  The court found L.R. and L.B. had been abandoned, pursuant to R.C. 2151.414(B)(1)(b), because there were missed visitation periods lasting longer than 90 days.  Alternatively, the court found the children could not be placed with mother or father within a reasonable time pursuant to R.C. 2151.414(B)(1)(a).  The trial court concluded granting permanent custody to FCCS was in the children's best interest.

## II. Assignments of Error

{¶ 21} Mother appeals and assigns the following two assignments of error for our review:

> [I.] The trial court's termination of Mother's parental rights and the permanent commitment of the children to FCCS was not supported by clear and convincing evidence and was against the manifest weight of the evidence that the commitment was in the children's best interests.
>
> [II.] The trial court's termination of Mother's parental rights and the permanent commitment of the children to FCCS was not supported by sufficient evidence that the commitment was in the children's best interests.

**III. Analysis**

**A. Applicable Law**

{¶ 22} "The right to parent one's child is a fundamental right protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 16, of the Ohio Constitution." *In re L.W.*, 10th Dist. No. 17AP-586, 2018-Ohio-2099, ¶ 6. *See also In re Murray*, 52 Ohio St.3d 155, 157 (1990), quoting *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) ("[T]he right to raise one's children is an 'essential' and 'basic civil right.' "). "Parents have a 'fundamental liberty interest' in the care, custody, and management of the child." *Id.* at 157, quoting *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). "Permanent termination of parental rights has been described as 'the family law equivalent of the death penalty in a criminal case.' Therefore, parents 'must be afforded every procedural and substantive protection the law allows.' " *In re Hayes*, 79 Ohio St.3d 46, 48 (1997), quoting *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist.1991).

{¶ 23} However, the state has broad authority to intervene to protect children from abuse and neglect. *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 28, citing R.C. 2151.01. An award of permanent custody, which terminates parental rights, is an " 'alternative of last resort and is only justified when it is necessary for the welfare of the children.' " *In re C.G.*, 10th Dist. No. 13AP-632, 2014-Ohio-279, ¶ 28, quoting *In re Swisher*, 10th Dist. No. 02AP-1408, 2003-Ohio-5446, ¶ 26.

{¶ 24} Pursuant to R.C. 2151.414(B)(1), a trial court may grant permanent custody of a child to an agency if the court determines, by clear and convincing evidence, that: (1) it is in the best interest of the child, and (2) one of the four factors set forth in R.C. 2151.414(B)(1) applies. "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. *See In re D.C.*, 10th Dist. No. 08AP-1010, 2009-Ohio-2145, ¶ 9, citing *In re Abram*, 10th Dist. No. 04AP-220, 2004-Ohio-5435 (finding it is not necessary for evidence to be "unequivocal" in order to meet the clear and convincing standard).

{¶ 25} In determining whether granting permanent custody to a public children services agency is in the child's best interest, the court must consider all relevant factors, including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1)(a) through (e). The additional factors referenced by R.C. 2151.414(D)(1)(e) are:

> (7) The parent has been convicted of or pleaded guilty to one of [a list of criminal offenses].
>
> (8) The parent has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food, and, in the case of withheld medical treatment, the parent withheld it for a purpose other than to treat the physical or mental illness or defect of the child by spiritual means through prayer alone in accordance with the tenets of a recognized religious body.

(9) The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section 2151.412 of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring treatment of the parent.

(10) The parent has abandoned the child.

(11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section 2151.353 or 2151.415 of the Revised Code, or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to those sections, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

R.C. 2151.414(E)(7) through (11).

{¶ 26} Moreover, in determining the best interest of the child, the court "shall not consider the effect the granting of permanent custody to the agency would have upon any parent of the child." R.C. 2151.414(C). *See In re V.B.-S.*, 10th Dist. No. 13AP-478, 2013-Ohio-5448, ¶ 36. Similarly, R.C. 2151.414(C) prohibits a court from "deny[ing] an agency's motion for permanent custody solely because the agency failed to implement any particular aspect of the child's case plan."

## B. Standard of Review

{¶ 27} On appeal, we will not reverse a trial court's determination that it was in the best interest of the children to grant a motion for permanent custody unless such determination is against the manifest weight of the evidence. *L.W.* at ¶ 8. " 'Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. * * * Weight is not a question of mathematics, but depends on [the evidence's] effect in inducing belief." ' " (Emphasis deleted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Black's Law Dictionary* 1594 (6th

Ed.1990). *See C.G.* at ¶ 31. Thus, in reviewing a judgment under the manifest weight standard, a court of appeals weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *Eastley* at ¶ 20.

{¶ 28} In conducting our review, we must make every reasonable presumption in favor of the trial court's findings of fact and judgment. *L.W.* at ¶ 8; *Eastley* at ¶ 21, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984), fn. 3. " '[I]f the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the trial court's verdict and judgment.' " *L.W.* at ¶ 8, quoting *Karches v. Cincinnati*, 38 Ohio St.3d 12, 19 (1988). Moreover, we recognize that " '[t]he discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceedings and the impact the court's determination will have on the lives of the parties concerned.' " (Quotations and citation omitted.) *In re W.D.*, 10th Dist. No. 09AP-589, 2009-Ohio-6903, ¶ 34, quoting *In re A.D.*, 10th Dist. No. 08AP-238, 2008-Ohio-3626, ¶ 8.

**C. Weight and Sufficiency of the Evidence Regarding Best Interest Conclusion**

{¶ 29} Initially, we note mother does not appear to contest the trial court's finding that L.R. and L.B. had been abandoned, pursuant to R.C. 2151.414(B)(1)(b), because there had been periods of missed visitation of more than 90 days. Mother also does not appear to challenge the trial court's alternative finding under R.C. 2151.414(B)(1)(a) that the children could not be placed with either parent within a reasonable period of time or should not be placed with either parent. Therefore, our review is limited to whether the juvenile court's conclusion that granting permanent custody to FCCS was in the best interest of the children was supported by the manifest weight of the evidence. *See L.W.* at ¶ 13. Mother challenges both the sufficiency and the weight of the evidence supporting the court's conclusion that granting permanent custody to FCCS was in the best interest of the children. "[T]hough sufficiency and manifest weight are different legal concepts, a finding that a judgment is supported by the manifest weight of the evidence necessarily includes a

finding that sufficient evidence supports the judgment." *In re C.N.*, 10th Dist. No. 15AP-67, 2015-Ohio-2546, ¶ 9.

### 1. Children's Interactions and Relationships

{¶ 30} The first factor in determining whether a grant of permanent custody is in a child's best interest requires considering the interaction and interrelationship of the child with his parents, siblings, relatives, foster caregivers, and others. R.C. 2151.414(D)(1)(a). The juvenile court found that mother's visitations with the children had been erratic and she had no relationship with them. The court further noted there was testimony that the children were very bonded with their foster family.

{¶ 31} Gallagher testified mother had been inconsistent in attending visits with the children, and she was unable to observe mother visiting with the children due to mother's inconsistent attendance. Gallagher asserted mother had gaps of more than 90 days between visits and had last visited with the children in September 2018, which was more than 3 months prior to the hearing. Mother admitted to gaps in visitation, although she claimed the longest gap was approximately 45 days. The guardian ad litem observed one of mother's visits with the children and was equivocal about whether there was a bond between them, testifying "I can't say there was a bond - - there was and there was not a bond." (Jan. 31, 2019 Tr. at 73.)

{¶ 32} Both Anderson and Gallagher observed L.R. and L.B. with their foster family, testifying that the children were bonded with the foster parents. They both also testified there was a mutual bond between the children and their three older biological siblings living in the foster home. The guardian ad litem similarly testified the children were bonded with the foster parents and the older siblings living in the foster home.

### 2. Children's Wishes

{¶ 33} The second factor in determining whether a grant of permanent custody is in a child's best interest requires considering the wishes of the child, as expressed directly by the child or through the child's guardian ad litem. The court must give due regard to the child's maturity. R.C. 2151.414(D)(1)(b).

{¶ 34} Mother argues on appeal the children were too young to express their wishes regarding custody. In the decisions granting permanent custody, the court noted the guardian's testimony that the children were not verbal and were too young to express their

own wishes as to custody. The guardian recommended that permanent custody be granted to FCCS.

### 3. Custodial History

{¶ 35} The third factor in determining whether a grant of permanent custody is in a child's best interest requires considering the child's custodial history, including whether he has been in the temporary custody of a public service agency for 12 or more months of a consecutive 22-month period. R.C. 2151.414(D)(1)(c). The juvenile court found L.R. had been in continuous temporary custody of FCCS since August 21, 2017, and therefore reached 12 consecutive months of temporary custody on August 21, 2018. Similarly, the court found L.B. had been in continuous temporary custody of FCCS since May 24, 2018 when he left the hospital after birth. At the time of the hearing and order, L.B. had not been in FCCS's custody for 12 consecutive months, but he would reach that benchmark on May 24, 2019. Anderson testified at the hearing about the dates L.R. and L.B. were removed from mother's care and placed into temporary custody of FCCS.

### 4. Provision of a Legally Secure Permanent Placement

{¶ 36} The fourth factor in determining whether a grant of permanent custody is in a child's best interest requires considering the child's need for a legally secure placement and whether that type of placement can be achieved without a grant of permanent custody to a public agency. R.C. 2151.414(D)(1)(d). The trial court concluded both L.R. and L.B. were in need of a legally secure placement and the foster home placement provided them with stability. The court concluded no relatives were available for placement of the children.

{¶ 37} There was testimony that both of the children had special needs and were receiving therapy for those special needs while placed with the foster family. Anderson and Gallagher both testified mother failed to substantially complete the requirements of her case plan. She failed to consistently participate in drug treatment or demonstrate negative drug screenings. She also had inconsistent employment and housing history. Similarly, father failed to complete the elements of his case plan. Anderson and Gallagher testified the children's maternal grandmother was not considered to be an appropriate placement, and there was no evidence of any other potential relative who could take custody of the children.

### 5. Other Factors

{¶ 38}  The fifth factor in determining whether a grant of permanent custody is in a child's best interest requires considering whether certain other statutory factors apply. R.C. 2151.414(D)(1)(e).  As relevant to this appeal, the juvenile court found the factor set forth in R.C. 2151.414(E)(11) applied to mother and father.  That factor exists where a parent has had parental rights involuntarily terminated with respect to another child.  The trial court found mother had parental rights terminated as to four of her other children. Anderson testified at the hearing about the history of mother's involvement with FCCS and termination of her parental rights as to her older children, and evidence was introduced demonstrating FCCS had been granted permanent custody of four of mother's older children.

### 6. Conclusion Regarding Mother's Manifest Weight and Sufficiency Challenges

{¶ 39}  Based on our review of the evidence and testimony introduced at the hearing before the juvenile court, we find there was competent, credible evidence to support the court's conclusion that granting permanent custody to FCCS was in the children's best interest. Thus, we cannot conclude the juvenile court's determination was against the manifest weight of the evidence. Because the manifest weight of the evidence supported the juvenile court's determination, the evidence was necessarily sufficient to support that judgment.  *See C.N.* at ¶ 9.

{¶ 40}  Accordingly, we overrule mother's first and second assignments of error.

## IV. Conclusion

{¶ 41}  For the foregoing reasons, we overrule mother's two assignments of error and affirm the judgments of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgments affirmed.*

SADLER, P.J., and BROWN, J., concur.