[Cite as *In re D.R.-S.*, 2025-Ohio-2873.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the Matter of: | : | |
| | | No. 24AP-414 |
| [D.R.-S., | : | (C.P.C. No. 19JU-14111) |
| | | |
| P.R.-C., Mother, | : | (REGULAR CALENDAR) |
| Appellant]. | : | |

---

D E C I S I O N

Rendered on August 14, 2025

---

**On brief:** *John T. Ryerson*, for appellant.

**On brief:** *Robert J. McClaren*, for Franklin County Children Services.

---

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

DORRIAN, J.

{¶ 1} Appellant, P.R.-C., mother of D.R.-S., ("mother") appeals from the June 4, 2024 decision and judgment entry of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, terminating her parental rights and granting permanent custody of D.R.-S to Franklin County Children Services ("FCCS"). For the following reasons, we affirm.

## I. Facts and Procedural History

{¶ 2} FCCS filed a complaint on December 10, 2019, asserting D.R.-S. was a neglected and dependent child based on allegations that mother's husband, G.C., committed domestic violence against mother while D.R.-S. was present and that D.R.-S. was struck during the incident. The complaint also alleged that G.C. held mother and D.R.-S. captive at knife point, that mother was using drugs in the home, and that mother and G.C. were selling drugs from the home. D.R.-S.'s father, L.S., ("father") reported that

mother had left D.R.-S. with a random man for three days and that D.R.-S. was being left with an aunt for weeks at a time. At the time of the complaint, FCCS caseworkers had been unable to contact mother. D.R.-S. was three years old when the complaint was filed.

{¶ 3} A magistrate granted a temporary order of protective service to FCCS, ordering FCCS to fully investigate the home and the needs of the child and provide appropriate services and protective supervision. A case plan was filed in January 2020, providing that D.R.-S. would not be exposed to domestic violence, mother and G.C. would avoid physical altercations, mother would maintain sobriety as established by drug testing, and mother would ensure D.R.-S. was not in any abusive or neglectful situations. The case plan also required mother to complete a drug and alcohol assessment and follow any recommendations issued by the provider, complete a mental health assessment and follow any recommendations issued by the provider, complete random drug testing, complete parenting classes, sign releases of information for FCCS, and meet with her caseworker monthly.[1] The case plan imposed similar requirements on father.

{¶ 4} In March 2020, the court issued an order finding D.R.-S. to be a neglected and dependent child, terminating the temporary order of protective supervision, and placing D.R.-S. under court ordered protective supervision by FCCS. In June 2020, the court-appointed guardian ad litem submitted a report recommending termination of the court order of protective services and a grant of temporary court commitment of D.R.-S. to FCCS. Later that month, the court issued an order terminating the court order of protective services and granting temporary court commitment of D.R.-S. to FCCS. In June 2021, the court issued an order extending temporary court custody to FCCS for six months.

{¶ 5} In November 2021, FCCS moved for permanent custody of D.R.-S. A hearing on the motion for permanent custody was scheduled for December 2, 2021, and copies of the motion and summons to appear were personally served on mother and father. After several continuances, in January 2023, the court issued an order permitting FCCS to place D.R.-S. with father for up to 90 days in an attempt to transition to reunification. However, the placement with father was later terminated and FCCS continued to pursue permanent custody.

---

[1] Amended case plans were filed during the proceedings, but these general requirements remained consistent through the amendments.

{¶ 6}    Ultimately, the hearing on the motion for permanent custody commenced on July 18, 2023. Mother was present at that hearing and represented by counsel; father was represented by counsel but did not appear. On the first day of the hearing, mother testified that D.R.-S. last lived with her in 2019. She claimed that the domestic violence incident that led to the filing of FCCS's complaint was G.C.'s fault and that she could not control his actions. Mother asserted she had done what she could to protect D.R.-S., including calling the police, changing her residence, and getting G.C. deported. Mother claimed she had completed parenting classes, a domestic violence assessment, a mental health assessment, and an alcohol and drug assessment, and that she had sent all the relevant documentation to her first caseworker. Mother admitted she previously used illegal drugs but claimed she had not used them since 2017. She asserted her Fifth Amendment rights when asked whether she had any current legal issues regarding drugs. Mother acknowledged that she was required to complete random drug tests as part of her case plan and claimed she called in every day to check whether a test was required. Mother claimed her doctor tried to send documentation about her prescription medications to her caseworker and appeared to suggest that this would explain positive test results for amphetamines or methamphetamines.

{¶ 7}    Mother asserted she lived with her uncle and that her name was on the lease for the residence; she also asserted that she had lived at that residence for three years. Mother testified that home renovation projects had been ongoing when the caseworker visited but claimed the renovations were complete. Mother asserted she had worked for Easy Care Home Health since 2019 and claimed she had provided proof of employment to her caseworker. She asserted there was a child-care facility next door where D.R.-S. could go when she worked if he was returned to her custody.

{¶ 8}    Mother admitted to an event the prior year in which a man identified as J.B. choked her. Mother initially referred to J.B. as a "friend" but on further questioning called him an "associate" because "no friend does that to somebody that they love." (July 18, 2023 Tr. at 36.) Mother claimed J.B. had been jailed because of the incident and was subject to a stay-away order. Mother admitted the police had been called to her residence "probably a lot" in the past year because of J.B. but claimed they had not been called since J.B. had been incarcerated. (July 18, 2023 Tr. at 39.) Mother claimed J.B. was never violent with her when D.R.-S. was around and that she did not believe J.B. would contact her again

because of the stay-away order. Mother asserted there had never been any domestic violence in front of D.R.-S., even in the incident with G.C. When asked about her visitation with D.R.-S., mother claimed she had been consistent in attending, while also admitting to missing some appointments due to transportation problems or changes made by the caseworker.

{¶ 9} The caseworker, Somalia Andrews, testified she had been assigned to the case in April 2022 and that the prior caseworker reviewed a summary of the case with her when it was assigned. Andrews asserted that FCCS had previously been involved with D.R.-S. beginning in 2017 and that he had been returned to mother's custody in 2019.[2] FCCS then filed the present action in late 2019. Andrews testified D.R.-S. had been continuously in the custody of FCCS since June 2020. Andrews asserted she had met with mother monthly in mother's home and discussed the case plan with her. Andrews acknowledged that mother signed release of information forms but asserted she did not have documentation of many of the activities mother claimed to have completed. Andrews testified she had no record of mother completing a mental health assessment or an alcohol and drug assessment but she did receive records establishing that mother completed parenting classes.

{¶ 10} Andrews asserted the case plan required mother to complete two random drug tests per week and mother had not been consistently completing the tests. Andrews testified that records indicated mother had only completed four drug tests in 2023 and only nine drug tests since Andrews became the caseworker in April 2022. Andrews stated that all nine of the completed drug tests since April 2022 had positive results. Mother told Andrews she had a prescription for Adderall in an attempt to explain the positive results but had not provided information directly from her physician about the prescription. Andrews also testified that mother had never provided proof of income from her employment. With respect to mother's living situation, Andrews claimed her last visit to mother's home was in June 2023 and that renovations were still underway at the time. Andrews testified she had concerns about people going in and out of the house during construction if D.R.-S. was returned to mother's custody.

---

[2] In 2017, FCCS filed a complaint in Franklin C.P. No. 17JU-12325 alleging that D.R.-S. was an abused, neglected, or dependent child. That case was dismissed without prejudice and re-filed as 18JU-28 and then dismissed and re-filed again as 18JU-3503. D.R.-S. was made a ward of the court and committed temporarily to the custody of FCCS in June 2018. The temporary order of custody was terminated in April 2019, and D.R.-S. was returned to the custody of mother.

{¶ 11} Andrews testified that she did not believe mother had successfully completed her case plan objectives related to undergoing mental health and alcohol and drug assessments and following any recommendations resulting from those assessments. Andrews testified that mother had weekly supervised visitations with D.R.-S. scheduled and that over the past six months mother's attendance at those visitations had been inconsistent. Andrews further testified that mother had been more consistent in participating in visitation during the two months leading up to the hearing. Andrews explained that at one point during the case father was permitted to have extended unsupervised visits with D.R.-S. but those were terminated after it was discovered that father was taking D.R.-S. to mother's home during the unsupervised visits. Andrews testified she had not been able to observe mother's visitation with D.R.-S. but that the visitation reports indicated mother and D.R.-S. had positive interactions and that they were bonded. With respect to D.R.-S.'s particular needs, Andrews testified he had been diagnosed with ADHD and was on medication for treatment. Andrews asserted that when asked where he wanted to live, D.R.-S. would respond "here," meaning his current foster placement, but that when he was in a prior placement he would respond that he wanted to live with mother and his first foster parent. Andrews testified she believed the issues leading to FCCS's involvement with D.R.-S. had not been resolved because there continued to be domestic violence and drug use concerns with mother.

{¶ 12} Amanda McNeal, the guardian ad litem appointed for D.R.-S., testified she was assigned to the case in March 2020 and met with D.R.-S. monthly. McNeal asserted that the interactions between mother and D.R.-S. she had observed were positive and that mother and D.R.-S. were bonded. She testified that D.R.-S. had most recently expressed a desire to live in his current foster placement and that his interactions with the other children in that home were positive. McNeal testified that D.R.-S. had behavioral issues at school, including physical altercations and running away from the school building. She also testified regarding the interventions implemented by the school and D.R.-S.'s foster family to address those behaviors. McNeal asserted she had previously recommended allowing extended visits with father in an attempt to place D.R.-S. with father but changed her recommendation due to conflicts between mother and father that led to criminal charges being filed. McNeal testified that her current recommendation was a grant of permanent custody to FCCS, asserting that neither parent demonstrated the level of care and

consistency that D.R.-S. needed or established adequate follow through on their case plan objectives. McNeal expressed concerns about D.R.-S. being exposed to domestic violence and drug use, and attempting to escape the home, if he was returned to mother's custody.

{¶ 13} The hearing continued on July 19, 2023, with additional testimony from McNeal. FCCS then sought to recall Andrews as a witness, which the trial court permitted over objections from mother's trial counsel and father's trial counsel. After being recalled, Andrews identified records related to the prior custody actions involving D.R.-S. and a criminal proceeding arising from a domestic violence incident between mother and father.

{¶ 14} At the request of father's counsel, the trial court agreed to conduct an in-camera interview of D.R.-S. regarding his preferred placement. That interview occurred on August 8, 2023. Following the interview, the trial court appointed an attorney to represent D.R.-S. In October 2023, FCCS moved to reopen the record to allow additional evidence. The trial court granted the motion and ordered hearings to be conducted on February 7 and 8, 2024.

{¶ 15} Neither mother nor father appeared at the February 7, 2024 hearing. Mother's counsel requested a continuance due to her absence, asserting he had not had recent contact with her but noting that she had attended every prior hearing and did not have a habit of missing hearings. The trial court denied the continuance request, noting that D.R.-S. had been in foster care for an extended time and the case had been continued in an attempt to allow mother to reunite with D.R.-S. The court also concluded that mother's counsel was present and capable of representing her interests and cross-examining witnesses. Mother's probation officer, Lucas Nyarko, testified about mother being placed on probation on July 24, 2023, after pleading guilty to attempted aggravated possession of drugs. Mother's initial term of probation was six months but the term was extended in January 2024 due to mother's failure to comply with the terms of probation. Nyarko testified that mother failed to regularly attend meetings with her probation officer and had not complied with a monthly drug test requirement. Nyarko also testified that J.B. accompanied mother to one of her probation meetings and that the probation officer had concerns about mother being in an unsafe relationship with J.B. because of messages from mother indicating J.B. may have been violent toward her.

{¶ 16} Kevin Everhart, an employee of Averhealth/American Court Services, testified regarding the drug test process and mother's drug test reports from August 2023

through February 2024. Everhart testified that mother's drug tests showed positive results for amphetamines, methamphetamines, and cannabinoid in August, September, and October 2023. He acknowledged there was a medication that would result in a positive test for methamphetamine but that the test used by his laboratory tested for the presence of the "street drug" form of methamphetamine. Everhart testified that mother failed to appear for any drug tests from October 4, 2023 through February 5, 2024. The drug test reports did not reflect that mother submitted any explanation or excuse for failing to appear for those tests.

{¶ 17} The hearing continued on February 8, 2024; again, neither mother nor father appeared. Andrews testified about mother being placed on probation after the prior hearing and about the extension of that probation. Andrews further testified that mother had pending criminal charges against her. Andrews asserted that mother had been inconsistent in meeting with her since the July 2023 hearings and that she had only been able to meet with mother four or five times since those hearings. Andrews testified that mother had missed 13 scheduled visitations with D.R.-S. since the July 2023 hearings. She also testified that mother was inconsistent in completing her drug tests, asserting that mother had only completed 7 or 8 of the 54 scheduled tests since August 2023.

{¶ 18} Andrews stated that since the July 2023 hearings, mother had lifted the stay-away order against J.B., reportedly because she wanted to join a substance abuse treatment program he was also in. Andrews expressed concern about mother's willingness to be exposed to someone who had previously harmed her and the potential for exposing D.R.-S. to harm. Andrews testified mother was living in the same residence that she was during the July 2023 hearings, but Andrews expressed concerns about the stability of that location because there had been legal disputes with the landlord. Mother still had not provided Andrews with proof of her employment, and Andrews had been unable to find information about the business online.

{¶ 19} Andrews testified that mother had not successfully completed the objectives of her case plan and that the domestic violence and drug use concerns that led to the filing of the complaint remained. Andrews stated FCCS was seeking permanent custody of D.R.-S. because a legally secure placement for him could not be obtained without a grant of permanent custody. Andrews testified that one of D.R.-S.'s prior foster homes was a

potential adoptive placement. She asserted D.R.-S. was bonded with the former foster parent and still asked about him.

{¶ 20} McNeal also testified at the February 8, 2024 hearing, asserting she had met with mother only once since the July 2023 hearings and had not observed any of mother's visits with D.R.-S. during that time. McNeal stated D.R.-S. expressed a desire to live with mother during her most recent meeting in January 2024. However, McNeal continued to recommend that permanent custody be granted to FCCS. McNeal asserted that mother's case plan compliance had diminished since the July 2023 hearings, that mother had been less diligent about getting visitation with D.R.-S. reinstated after it was briefly cancelled, and that mother had not attended scheduled school meetings. McNeal expressed concern about whether mother would be able to consistently facilitate D.R.-S.'s psychiatrist and counseling appointments and whether she would put him at risk for dangerous behavior including running away.

{¶ 21} In a decision and judgment entry issued on June 4, 2024, the trial court granted FCCS's motion and committed D.R.-S. to the permanent custody of FCCS. The court found by clear and convincing evidence that, pursuant to R.C. 2151.414(B)(1)(d), D.R.-S. had been in the custody of FCCS for 12 or more months out of a consecutive 22-month period. The court further found that awarding permanent custody of D.R.-S. to FCCS was in his best interest based on the court's consideration of the factors set forth in R.C. 2151.414(D).

## II. Assignments of Error

{¶ 22} Mother appeals and assigns the following three assignments of error for our review:

> I. The Court below committed reversible and plain error in proceeding on a permanent custody motion, and granting that motion, on two trial dates that appellant Mother had no actual knowledge of, because she had not been notified according to rule and law.
>
> II. The Court below committed reversible and plain error when it allowed Franklin County Children Services (FCCS) to recall and re-directly examine the FCCS caseworker after she had already testified.
>
> III. The Court's Judgment and Decision Entry granting the permanent court commitment (PCC) of the minor child is

against the manifest weight of the evidence, since Mother had substantially completed her reunification case plan requirements, and the child could and should have been returned to Mother within a reasonable amount of time.

## III. Discussion

### A. Whether the trial court erred by conducting the February 7 and 8, 2024 hearings without mother present

{¶ 23} In her first assignment of error, mother asserts the trial court erred by conducting the February 7 and 8, 2024 hearings without her being present. Mother argues that Juv.R. 20(A) and Civ.R. 5(A) required written notice of all court hearings to be served on her and that her right to due process was violated because she did not receive actual notice of the hearings scheduled for February 7 and 8, 2024.

{¶ 24} "Parents have a 'fundamental liberty interest' in the care, custody, and management of [a] child." *In re Murray*, 52 Ohio St.3d 155, 157 (1990), citing *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). Accordingly, "[t]he right to parent one's child is a fundamental right protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 16, of the Ohio Constitution." *In re L.W.*, 2018-Ohio-2099, ¶ 6 (10th Dist.). That right is not unlimited, however, and the state has broad authority to intervene to protect children from abuse and neglect. *In re L.B.*, 2020-Ohio-3045, ¶ 23 (10th Dist.). As an "alternative of last resort . . . only justified when it is necessary for the welfare of the children," a court may terminate parental rights and commit a child to the permanent custody of a public children services agency. *In re Swisher*, 2003-Ohio-5446, ¶ 26 (10th Dist.). Because of the extreme nature of this remedy, which has been likened to the family law equivalent of the death penalty, parents must be afforded every procedural and substantive protection authorized by law. *L.B.* at ¶ 22.

{¶ 25} "In cases involving the permanent termination of parental rights, due process requires ' "a hearing upon adequate notice, assistance of counsel, and under most circumstances, the right to be present at the hearing." ' " *In re J.M.*, 2025-Ohio-2410, ¶ 18 (10th Dist.), quoting *In re M.W.*, 2007-Ohio-6506, ¶ 79 (10th Dist.), quoting *In re J.Z.*, 2005-Ohio-3285, ¶ 9 (10th Dist.). However, a parent does not have an absolute right to be present at a permanent custody hearing and " 'a parent facing termination of parental rights must exhibit cooperation and must communicate with counsel and with the court in order

to have standing to argue that due process was not followed in a termination proceeding.' " *Id.* at ¶ 19, quoting *In re Q.G.*, 2007-Ohio-1312, ¶ 12 (8th Dist.).

{¶ 26} Juv.R. 20(A) requires written notices to be served "upon each of the parties" and that Civ.R. 5(A) similarly requires "every written notice" to be "served upon each of the parties." Mother asserts these rules required she be served with written notice of the February 7 and 8, 2024 hearings and argues the trial court erred by proceeding in her absence because she did not have actual notice of the hearings. In support of her argument, mother cites a recent decision in which this court suggested that the record failed to establish that a parent had been served with adequate notice of a permanent custody hearing. *See In re B.H.*, 2023-Ohio-3491, ¶ 41 (10th Dist.).

{¶ 27} In this case, mother was represented by counsel, whereas the parent in the *B.H.* case was not represented by counsel. Juv.R. 20(B) provides that when "service is required or permitted to be made upon a party represented by an attorney, the service shall be made upon the attorney unless service is ordered by the court upon the party." Likewise, Civ.R. 5(B)(1) states that "[i]f a party is represented by an attorney, service under this rule shall be made on the attorney unless the court orders service on the party." Mother was represented by counsel in this case and does not dispute that her counsel, who appeared at the February 7 and 8, 2024 hearings, was properly served with notice of those hearings. Because mother's counsel was served with notice of the February 7 and 8, 2024 hearings, mother was properly served with that notice as provided by the rules. *J.M.* at ¶ 24 ("Therefore, under Civ.R. 5 and Juv.R. 20, counsel for Mother was properly served with notice and, by extension, so was Mother."). *See In re C.B.*, 2020-Ohio-5151, ¶ 16 (4th Dist.) ("Generally, notice of new or rescheduled hearings is sent to the parent's attorney, as prescribed by Juv.R. 20."); *In re D.H.*, 2008-Ohio-3686, ¶ 38 (8th Dist.) ("Ohio courts have consistently recognized that notice of new or rescheduled hearings sent to a parent's attorney, as prescribed under Juv.R. 20, satisfies the notice requirement.").

{¶ 28} Moreover, the record reflects that notice of the February 7 and 8, 2024 hearings was sent to mother by regular mail on October 25, 2023. The address of record for mother at that time was the same address she testified to living at during the July 18, 2023 hearing. There is nothing in the record indicating that the regular mail notices to

mother were returned as undeliverable.[3]  *See J.M.*, 2025-Ohio-2410, at ¶ 22 (10th Dist.) ("[T]he record readily shows that Mother was sent notice of the May 13, 2024 hearing on the PCC motion, to wit: on March 20, 2024, an original copy of the hearing notice for May 13, 2024, at 10:00 a.m., was filed on the docket and mailed to Mother at her last known physical address.  The docket does not show any return of service indicating that the mailed notice was returned as undeliverable.").  Further, although mother's appellate brief asserts she never received written notice of the February 7 and 8, 2024 hearings, mother has not presented any record evidence supporting that claim.  *See Liberty Credit Servs. v. Walsh*, 2005-Ohio-894, ¶ 13 (10th Dist.) (concluding service of a complaint was not reasonably calculated to reach the defendant based on the defendant's affidavit in support of a motion for relief from default judgment averring that the complaint was addressed to a surname she had not used for nearly 20 years and sent to an address she had moved away from months before the complaint was filed).

{¶ 29} In support of her first assignment of error, mother also appears to argue that the trial court erred by denying her trial counsel's continuance request, suggesting the court did not appropriately weigh the relevant factors when determining whether to grant a continuance.  However, mother did not identify denial of the continuance request as part of her first assignment of error.  Under the appellate rules, this court decides assignments of error, not arguments or issues contained in a brief; accordingly, we decline to address this argument.  *See Watkins v. Ohio Bd. of Edn.*, 2023-Ohio-2595, ¶ 32 (10th Dist.); *Hamilton v. Hamilton*, 2016-Ohio-5900, ¶ 9 (10th Dist.).

{¶ 30} Under the circumstances in this case, where mother was represented by counsel who received notice of the February 7 and 8, 2024 hearings and appeared at those hearings, and where notice of the hearings was issued to mother by regular mail at her address of record and there was no record that those mailings were returned to the court as

---

[3] We note that although mother's trial counsel asserted that mother did not have a habit of missing hearings, the evidence presented at the February 7 and 8, 2024 hearings tended to demonstrate behavior during the period after the July 2023 hearings that was consistent with failing to appear at the February 7 and 8, 2024 hearings. Nyarko testified mother failed to appear for regular meetings with her probation officer and had not complied with the monthly drug test requirement of her probation. Similarly, Everhart testified that mother failed to appear for any of the drug tests required under her case plan during the four-month period from October 4, 2023 through February 5, 2024. Andrews testified that mother failed to attend 13 scheduled visitations with D.R.-S. since the July 2023 hearings.

undeliverable, the trial court did not err by proceeding with the February 7 and 8, 2024 hearings without mother present.

{¶ 31} Accordingly, we overrule mother's first assignment of error.

## B. Whether the trial court erred by permitting FCCS to recall Andrews to give additional direct examination testimony

{¶ 32} In her second assignment of error, mother asserts the trial court erred by allowing FCCS to recall Andrews to provide direct examination testimony during the July 19, 2023 hearing when her testimony had been completed the prior day. Mother cites R.C. 2315.01, which generally sets forth procedures for a jury trial, and R.C. 2315.08, which makes those procedures applicable to trials conducted by the court. In relevant part, R.C. 2315.01 provides that "[t]he party who would be defeated if no evidence were offered on either side, first, shall produce that party's evidence, and the adverse party shall then produce the adverse party's evidence." R.C. 2315.01(A)(3). The statute further provides that "[t]he parties then shall be confined to rebutting evidence, unless the court for good reasons and in the furtherance of justice, permits them to offer evidence in their original cases." R.C. 2315.01(A)(4). Mother argues that allowing FCCS to recall Andrews as a witness on direct examination violated the statutory order of trial set forth in these statutes.

{¶ 33} We note that Andrews also gave direct examination testimony during the February 8, 2024 hearing, held after the trial court granted FCCS's motion to reopen the record to allow additional evidence. Mother's second assignment of error does not assert that the trial court erred by allowing Andrews to be called as a witness at the February 8, 2024 hearing.

{¶ 34} While R.C. 2315.01 sets forth the general order of trial presentation, with respect to presentation of witnesses, Evid.R. 611(A) provides that the trial court "shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence." This court has held that "whether to allow a witness to be recalled lies within the sound discretion of the trial court." *State v. Riley*, 1975 Ohio App. LEXIS 8348, *2 (10th Dist. June 30, 1975). *See Columbus v. Grant*, 1 Ohio App.3d 96, 97 (10th Dist. 1981) (affirming court's prior holding that "the question of opening up a case for the presentation of further testimony is within the sound discretion of the trial court, and the court's action in that regard will not be disturbed on appeal unless under the circumstances it amounted to an abuse of discretion"); *State v. Kaimachiande*, 2019-Ohio-1939, ¶ 19 (3d

Dist.) (citing *Grant*). Other appellate courts also have applied the abuse of discretion standard when a trial court decision permitting recall of a witness is challenged on appeal. *See State v. Berry*, 2013-Ohio-2380, ¶ 64 (3d Dist.) ("Based on the court's inherent authority to regulate witnesses called, we cannot find that the trial court abused its discretion in allowing Shannon to be recalled, especially in light of the fact that she was fully subject to cross-examination and the jury had the ability to judge her credibility."); *State v. Anderson*, 2010-Ohio-6234, ¶ 9-19 (1st Dist.) (applying abuse of discretion standard to trial court's decision allowing prosecution to recall a witness for the purpose of allowing him to change his testimony); *In re Leah Marie S.*, 2008-Ohio-360, ¶ 9 (6th Dist.) ("Appellant acknowledges that the decision to allow a witness to be recalled or to allow a party to reopen its case is reviewed for an abuse of discretion."); *State v. Jones*, 2001 Ohio App. LEXIS 2172, *12-13 (8th Dist. May 17, 2001) ("A trial court has discretion in deciding whether to allow a witness who has already testified to be recalled for further testimony."). An abuse of discretion occurs when a decision is unreasonable, arbitrary, or unconscionable; however, a court lacks authority to commit an error of law when exercising its discretion. *Campbell v. 1 Spring, L.L.C.*, 2024-Ohio-308, ¶ 10 (10th Dist.).

{¶ 35} In this case, father's trial counsel and mother's trial counsel both objected when FCCS sought to recall Andrews as a witness during the July 19, 2023 hearing. They argued FCCS did not reserve the right to recall Andrews and that it was procedurally incorrect to allow Andrews to give additional direct testimony when her testimony had been completed the day before. FCCS's counsel asserted she was recalling Andrews for the purpose of entering certain exhibits into evidence. The trial court overruled the objections and allowed Andrews to testify. After being recalled as a witness, Andrews identified orders entered in earlier cases involving D.R.-S. Andrews also testified that FCCS ceased efforts to reunite D.R.-S. with father because of a domestic violence incident between mother and father, and identified the complaint and sentencing entry in a criminal case in which father was convicted of aggravated menacing against mother. The court afforded mother's trial counsel and father's trial counsel the opportunity to cross-examine Andrews during the July 19, 2023 hearing but they both declined.

{¶ 36} Under the circumstances in this case, where Andrews was recalled on direct examination during the July 19, 2023 hearing to identify court records in other related

cases and was subject to cross-examination regarding that testimony, we find no abuse of discretion by the trial court in allowing Andrews to be recalled as a witness.

{¶ 37} Accordingly, we overrule mother's second assignment of error.

### C. Whether the trial court's decision was against the manifest weight of the evidence

{¶ 38} In her third assignment of error, mother argues the decision terminating her parental rights was against the manifest weight of evidence because she substantially completed her case plan. Mother asserts that her compliance with the case plan demonstrated that D.R.-S. could have been returned to her custody within a reasonable time.

### 1. Law governing termination of parental rights

{¶ 39} As explained above, parents have a fundamental liberty interest in the care and custody of children but when it is necessary for the welfare of the child a court may terminate parental rights and commit a child to the permanent custody of a public children services agency. *See Swisher*, 2003-Ohio-5446, at ¶ 26 (10th Dist.). The trial court may grant permanent custody of a child to a public children services agency if the court determines by clear and convincing evidence that: (1) it is in the child's best interest, and (2) one of the factors contained in R.C. 2151.414(B)(1) applies. R.C. 2151.414(B)(1); *L.B.*, 2020-Ohio-3045, at ¶ 24 (10th Dist.). In determining whether granting permanent custody is in the child's best interest, the court must consider all relevant factors, including specific factors set forth in R.C. 2151.414(D)(1)(a) through (e). "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

### 2. Standard of review for a grant of permanent custody

{¶ 40} "[T]he proper appellate standards of review to apply in cases involving a juvenile court's decision under R.C. 2151.414 to award permanent custody of a child and to terminate parental rights are the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards, as appropriate depending on the nature of the arguments that are presented by the parties." *In re Z.C.*, 2023-Ohio-4703, ¶ 18. In this appeal, mother asserts

the trial court's judgment was against the manifest weight of the evidence. "When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Id.* at ¶ 14, citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. We must make every reasonable presumption in favor of the trial court's findings of fact and judgment and, if the evidence is susceptible to more than one construction, give it the interpretation most consistent with the trial court's verdict and judgment. *Id.* Moreover, we have held that a juvenile court's discretion in determining whether permanent custody is in a child's best interest " ' 'should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." ' " *In re A.L.D.*, 2008-Ohio-3626, ¶ 8 (10th Dist.), quoting *In re Hogle*, 2000 Ohio App. LEXIS 2813, *12 (10th Dist. June 27, 2000), quoting *In re Awkal*, 95 Ohio App.3d 309, 316 (8th Dist. 1994).

### 3. Trial court's determination that granting permanent custody to FCCS was in D.R.-S.'s best interest

{¶ 41} Mother does not dispute that D.R.-S. had been in the custody of FCCS for more than 12 months in a consecutive 22-month period. The evidence in this case established that D.R.-S. had been in the custody of FCCS continuously since June 2020; therefore, the trial court's conclusion that R.C. 2151.414(B)(1)(d) applied was not against the manifest weight of the evidence.

{¶ 42} Mother's argument on appeal focuses on the trial court's conclusion that she repeatedly failed to substantially remedy the conditions that caused D.R.-S. to be placed in the custody of FCCS. Mother claims the evidence presented during the July 2023 hearings established that she substantially completed the requirements of her case plan and remedied the conditions that led to the initial placement of D.R.-S. in the custody of FCCS. Mother asserts she completed an alcohol and drug assessment and submitted to multiple drug tests. Mother claims the positive results for amphetamines on her drug tests can be explained by a prescription medication used to treat ADHD. She also asserts that she completed a domestic violence assessment and that no further services were recommended because she had been linked with a victim advocate. Mother claims she completed a mental health assessment and parenting classes. Mother further claims that she completed release

of information forms for her caseworker and that the caseworker failed to follow up on obtaining information. Mother argues she is bonded with D.R.-S. and visited with him regularly, claiming that some visits were cancelled by foster families or by FCCS. She asserts she has had stable housing since the beginning of the case and has been employed by the same company for several years.

{¶ 43} This court has held that " 'while evidence of case plan compliance is relevant to a best-interest determination, it is not dispositive of it.' " *In re M.W.*, 2020-Ohio-5199, ¶ 57 (10th Dist.), quoting *In re T.W.*, 2011-Ohio-903, ¶ 55 (10th Dist.). *See In re Brooks*, 2004-Ohio-3887, ¶ 62 (10th Dist.) (noting that "R.C. 2151.414(D) does not require courts to deny a children services agency's motion for permanent custody solely by virtue of a parent's substantial compliance with [a] case plan"). Moreover, there was evidence presented at the July 2023 and February 2024 hearings that supported the trial court's conclusion that mother failed to remedy the conditions that caused D.R.-S. to be placed in the custody of FCCS.

{¶ 44} The caseworker, Andrews, acknowledged that mother signed release of information forms but testified she had not received documentation to prove many of mother's claimed activities. Andrews had no record of mother completing a mental health assessment or an alcohol and drug assessment. Andrews testified at the July 2023 hearings that mother had not been consistently completing drug tests and that all nine drug tests mother had completed since April 2022 contained positive results. There was further evidence presented at the February 2024 hearings of mother's non-compliance with the drug testing requirement and positive results on the tests she did complete. Although mother claimed that her prescription medication could explain the positive results for amphetamines, there was no proffered explanation for the positive results for methamphetamines. Andrews also testified at the July 2023 and February 2024 hearings that mother's visitations with D.R.-S. had been inconsistent. Andrews testified that mother had lifted the stay-away order against J.B. and mother's probation officer testified there were concerns about her exposure to domestic violence in that relationship. Also, there was evidence at the February 2024 hearings that mother had been placed on probation due to a criminal conviction and that her probation term had been extended due to non-compliance with the conditions of probation. Thus, while there was evidence tending to establish that mother complied with some portions of her case plan, there was also evidence

demonstrating that mother failed to comply with other requirements of the case plan and that the domestic violence and substance abuse issues that caused D.R.-S. to be placed in the custody of FCCS remained. *See In re L.W.*, 2025-Ohio-2236, ¶ 37 (10th Dist.) ("Even though [mother] made significant progress on several aspects of her case plan related to securing housing and employment, and the evidence shows that L.W. has bonded with her, the concerning aspects of domestic violence, substance abuse, and mental health continued to be issues at the time of trial.").

{¶ 45} Mother's appeal does not specifically challenge the trial court's other findings regarding the best interest factors. Based on our review of the trial court's decision and the evidence contained in the record and presented at the July 2023 and February 2024 hearings, we conclude there was support for the court's findings as to those factors. In this case, the court did not clearly lose its way or create a manifest miscarriage of justice in concluding that granting permanent custody of D.R.-S. to FCCS was in D.R.-S.'s best interest.

{¶ 46} Accordingly, we overrule mother's third assignment of error.

## IV. Conclusion

{¶ 47} For the foregoing reasons, we overrule mother's three assignments of error and affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgment affirmed.*

JAMISON, P.J., and MENTEL, J., concur.

————————————